PEOPLE v STURDIVANT

Docket No. 77-4093. Submitted May 7, 1979, at Detroit.—Decided July 9, 1979. Leave to appeal applied for.

Terry Sturdivant was convicted in Detroit Recorder's Court, James Justin, J., of criminal sexual conduct in the first degree, criminal sexual conduct in the third degree and larceny from a person. During trial, the prosecutor called serologists from the police crime lab who testified concerning the results of blood type testing of a seminal stain found on the underpants worn by complainant at the time of the offenses. One serologist was permitted to testify that while 80% of the general population secrete their blood type in bodily fluids 20% do not, that the semen on the underpants came from a nonsecreter, and that, based on a blood typing of defendant, it was determined that he was a nonsecreter. Defendant appeals. *Held:*

1. The admission of the blood type evidence resulting from serological testing of seminal stains is error where the results of such testing are used solely to include the defendant in a class of possible perpetrators of the crime, since such evidence is of no probative value.

2. The admission of the blood type evidence, while error, was harmless error, since the complainant made a positive identification of the defendant and there was evidence of the complainant's opportunity to observe defendant.

Affirmed.

1. Evidence — Rape — Blood Typing — Seminal Stains — Probative Value.

The admission in a criminal sexual conduct trial of blood type evidence resulting from serological testing of seminal stains is error where the results of such testing are used solely to include the defendant in a class of possible perpetrators of the crime, since such evidence is of no probative value.

References for Points in Headnotes
[1, 2] 65 Am Jur 2d, Rape § 88.
Blood grouping tests. 46 ALR2d 1000.

2. Evidence — Rape — Blood Types — Identification — Harmless
    Error.

    The admission in a criminal sexual conduct trial of blood type
    evidence that serves only to include defendant in a class of
    possible perpetrators of the crime, while error, is harmless
    error where there is a positive identification of the defendant
    by the complainant, coupled with evidence of the complainant's
    opportunity to observe the defendant.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward R. Wilson,* Principal Attorney, Appeals, and *Don W. Atkins,* Assistant Prosecuting Attorney, for the people.

*James N. Garber (John C. Mouradian,* of counsel), for defendant on appeal.

Before: M. J. Kelly, P.J., and Bashara and R. B. Burns, JJ.

M. J. Kelly, P.J. On February 16, 1977, at 10 p.m., the complainant, Bonita Jones, was accosted near her home in Detroit by defendant, Terry Sturdivant, who told her that he had a gun. As they were standing near a streetlight, the complainant was able to clearly see the defendant's face. The defendant then took her to the attic of a vacant house where he raped her and took $66 from her pants pocket. In the course of the assault, defendant used a cigarette lighter to illuminate the room and the complainant was again given the opportunity to observe him. After a second penetration, defendant fled the house.

On March 3, 1977, in the course of the police investigation, the complainant viewed a photographic show-up containing defendant's picture. Although unable to positively identify defendant at this time, she did observe similarities between defendant's picture and her assailant. Subse-

quently, on March 14, 1977, the complainant positively identified defendant as her assailant at a police line-up. She again identified defendant at a preliminary examination held on March 21, 1977, and twice identified him at trial. At a pretrial evidentiary hearing, the trial court ruled that neither the photographic show-up nor the line-up were unnecessarily suggestive.

On August 4, 1977, following a jury trial, defendant was convicted of criminal sexual conduct in the first degree, MCL 750.520b(1); MSA 28.788(2)(1), criminal sexual conduct in the third degree, MCL 750.520d(1); MSA 28.788(4)(1), and larceny from a person, MCL 750.357; MSA 28.589. The trial court sentenced defendant to 19-1/2 to 55 years on the first offense, 10 to 15 years on the second and 6 years and 8 months to 10 years on the third.

Defendant raises a host of issues in this appeal; however, we find that only one merits extended discussion. Did the trial court commit reversible error in admitting expert scientific testimony regarding the analysis of seminal fluids found on complainant's clothing?

During the trial, two serologists from the police crime lab testified as to the results of tests they had conducted on the underpants worn by complainant at the time of the offense. The first to testify, Officer Ronald Badaczewski, testified that he found seminal fluid, but no blood, on the garment. The second serologist to testify, RaNell Davis, stated that she tested a swatch of cloth from the same sample, performing a secretory test typing on it. This test is used to determine blood types from other secreted body fluids, (semen, tears, saliva, etc.). She testified that 80% of the general population secrete their blood type in their

body fluids and 20% do not. Ms. Davis then testified that the complainant's panties contained no blood type secretion; this meant, in all likelihood, that the male whose sperm was on the panties, and the female who wore them, were both nonsecreters. She then testified that she did a blood typing on both the complainant and the defendant and that the results indicated that both were nonsecreters. Finally, she noted that it was relatively rare for both individuals in a rape case to be nonsecreters.

In sum, the testimony of Ms. Davis established only that the complainant's attacker was a member of that segment of the population who were nonsecreters, as was the defendant. Because this testimony served to include the defendant in the class of possible assailants, it thereby increased the probability of defendant's guilt without connecting him, in any way, to the charged offense. We hold that the admission of blood type evidence solely for the purposes of inclusion was error.

There is no Michigan criminal case on point with the instant case. However, the case law of other jurisdictions and our own case law developed in the context of the quasi-criminal paternity suit, where blood type testimony is often used as evidence, is instructive in resolving the posited issue.

New York represents the view that inclusion evidence has no probative value. In *People v Robinson,* 27 NY2d 864; 317 NYS2d 19; 265 NE2d 543 (1970), it was held that proof that the defendant in a murder prosecution had Type "A" blood and that semen found in and on the body of the decedent was secreted by a man with Type "A" blood was of no probative value in view of the large proportion of the general population having blood of this type, and therefore, should not have

been admitted; however, it was further held that, in view of the careful limitation on its consideration by the jury in the court's instruction and of the fully adequate case made out by the other proofs, the admission of such evidence was held not to be prejudicial. See also, *People v Macedonio,* 42 NY2d 944; 397 NYS2d 1002; 366 NE2d 1355 (1977).

However, the case of *People v Gillespie,* 24 Ill App 3d 567; 321 NE2d 398 (1974), represents the opposing view. In *Gillespie,* it was held that blood type evidence was admissible as one link in a chain of circumstantial evidence tending to prove the defendant's participation in a burglary where an expert witness testified that only 2.7% of the Negro population had Type "A" with a positive rheumatoid arthritis factor, as did defendant. See also *State v Gray,* 292 NC 270; 233 SE2d 905 (1977).

In our opinion, the latter cases are not persuasive authority for the proposition that blood type evidence, when used for purposes of inclusion, is admissible. In *Gillespie,* there was extensive testimony as to the frequency of Type "A" blood with a positive rheumatoid arthritis factor which ultimately limited the inclusive group to 2.7% of the black population. We have no such specificity here. The people's expert witness was able to limit the inclusive group of nonsecreters to only 20% of the general population. Similarly, in *Gray,* the court acknowledged the "somewhat tenuous" positive probative value of blood grouping testimony in a rape prosecution. In view of these distinguishing factors, we adhere to the view expressed in the New York cases which accords inclusion testimony no probative value.

In the context of paternity proceedings, more-

over, Michigan statute. and case law also provide for the exclusion of blood type testimony when used for purposes of inclusion. Thus, MCL 722.716; MSA 25.496, which concerns the admission of blood tests as evidence of paternity, states in relevant part:

"(d) The result of the [blood] tests shall be receivable in evidence in the trial of the case but only in cases where definite *exclusion* is established. If more than 1 expert is appointed by the court, and if they disagree in their findings or conclusions, neither the findings, conclusions or the results of these tests shall be admissible as evidence of the paternity or non-paternity of the alleged father." (Emphasis added.)

Michigan case law adheres to this legislative mandate.[1] In *People v Nichols,* 341 Mich 311; 67 NW2d 230 (1954), the Court held that the admission of testimony concerning the results of blood tests for the purpose of establishing paternity in bastardy proceedings constituted prejudicial and reversible error because such tests, although accurate and reliable to establish non-paternity, have no probative value whatsoever in establishing paternity. In reaching that conclusion, the Court quoted with approval the language of *State, ex rel Freeman v Morris,* 156 Ohio St 333; 102 NE2d 450 (1951), where it was stated:

" 'Therefore, it may be here repeated that it is established that there is complete accord of experts in biology upon the proposition that results from such blood tests, disclosing a mere possibility of paternity, must be

[1] Parenthetically, it should be noted that the Michigan statute, which bars the use of blood tests for inclusion purposes, is a modification of the Uniform Act on Blood Tests to Determine Paternity, which would permit their use for inclusion within the discretion of the trial court. This modification suggests a legislative mandate barring the use of blood tests for purposes of inclusion.

discarded and excluded from evidence as being value-less; and that their admission in evidence is prejudicial.' " 341 Mich at 329-330.

Similarly, in *Shepherd v Shepherd,* 81 Mich App 465, 471; 265 NW2d 374 (1978), this Court stated:

"Finally, we should note that under the holdings in Michigan and a majority of jurisdictions the results of blood tests, disclosing only that the alleged father might have sired the child, are irrelevant and inadmissible. But properly conducted tests which preclude paternity are conclusive and sufficient to rebut the presumption of legitimacy. *People v Nichols,* 341 Mich 311; 67 NW2d 230 (1954), *Kusior v Silver,* 54 Cal 2d 603; 7 Cal Rptr 129; 354 P2d 657 (1960), *Commonwealth v Stappen,* 336 Mass 174; 143 NE2d 221 (1975), Anno: 46 ALR3d 158."

We find that the foregoing case law and statute amply support the conclusion that blood type evidence, when used solely for the purpose of including a defendant in a class of possible defendants, has no probative value. Therefore, we hold that the trial court erred in admitting such evidence.

This holding, however, does not require reversal in the instant case. Here, the complainant had several opportunities to observe the defendant at the time of the attack and positively identified him on several occasions. The complainant's eyewitness testimony, if believed by the trier of fact, is sufficient evidence to convict. *People v Knapp,* 34 Mich App 325, 332; 191 NW2d 155 (1971). We hold that any error interjected into defendant's trial by the admission of the blood type evidence was harmless beyond a reasonable doubt under the standards set forth in *People v Christensen,* 64 Mich App 23, 32; 235 NW2d 50 (1975).

Affirmed.