[No. 8545-0-I. Division One. May 18, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. GARY J. HOYT, *Appellant.*

*Timothy McGarry,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Rebecca Roe, Deputy,* for respondent.

CALLOW, J.—Gary J. Hoyt was convicted of first degree burglary and two counts of rape. He possessed a deadly weapon when he committed each crime. The appeal raises the following issues:

1. Whether the defendant unlawfully was convicted of first degree burglary when he also was convicted of first degree rape.

2. Whether his mental disorder rendered involuntary his confession and written consent to the search of his apartment.

3. Whether the victim's out–of–court identification of the defendant should have been suppressed because she identified him from a photograph of a lineup the day after she had viewed the lineup and had identified another person as the possible rapist.

Hoyt was convicted of raping a 22–year–old Kirkland woman on the morning of January 15, 1979. When the victim answered a knock at the door, a man pushed her aside and briefly searched her residence. She either fell or was pushed to the living room floor where he raped her and scratched her body with a knife. She did not report the incident to the police at that time.

The same man returned to the victim's home on February 11, 1979 about 5:30 p.m. As she was carrying out the garbage, he grabbed her and pushed her down the stairway. He cut the front of her body with his knife, inserted the knife and his fingers into her vagina, and then left abruptly.

The victim reported the incidents to the Kirkland police on February 15. A detective was assigned to investigate the

case, and the victim assisted in composing an Identi–Kit picture.

On April 6, 1979, Hoyt entered the Kirkland Police Department and asked to speak with a detective. According to one of the detectives, Hoyt said that he had become a Christian and wished to confess his sins, including assaults on several young men and women that had occurred during the previous year and a half. When the detective assigned to investigate the rapes noticed a close resemblance between Hoyt and the composite drawing, the detective read Hoyt his rights, which Hoyt acknowledged. Hoyt also acknowledged that he wished to waive those rights and to continue speaking with the detectives.

In the lengthy conversation that followed, the defendant described the various assaults, including the two occasions when he raped the Kirkland woman. At the end of the session, he gave his written consent to search his apartment. The detective again read the defendant his rights, had him read them to himself, and received his written waiver of rights. No written statement was taken, however, because the defendant appeared tired and disoriented.

After the detectives conducted the search, they drove the defendant, with his consent, to the area of the victim's home to determine whether he could identify it. The defendant recognized the house and the accompanying stairway. He was placed under arrest when they returned to the police station. The next day, April 7, 1979, the detectives took the defendant's written statement after they had read him his rights and had received a signed waiver of rights.

On April 10, the victim returned from a 3–day business trip to Alaska and learned at midnight that she was to view a lineup the following morning. At the lineup, she became very upset when she learned that a younger girl was present, who possibly had been attacked by the same man. The victim identified the tallest person in the lineup as the possible assailant. She did not complete the form properly. The victim told her roommate on the way home that she

knew she had made a mistake and by the time they reached home, she had decided to return to the police station to explain. Before she could do so, the detective assigned to her case came to her door, and she explained the problem. The following day, the victim identified Hoyt as her assailant when she viewed pictures of the previous day's lineup.

The defendant was charged with first degree rape, first degree burglary, and possession of a deadly weapon for the January 15 attack. He was charged with first degree rape and possession of a deadly weapon for the February 11 attack.

## I
### BURGLARY AND RAPE CONVICTIONS

First, Hoyt argues that the first degree burglary[1] conviction "merged" into the first degree rape[2] conviction under the rationale of *State v. Johnson*, 92 Wn.2d 671, 600 P.2d 1249 (1979). We disagree. *Johnson* held that a defendant cannot be separately convicted of any crime used to elevate a rape to the first degree "unless [the other crime] involves some injury to . . . the victim . . ., which is separate and distinct from and not merely incidental to the crime of which it forms an element." *State v. Johnson, supra* at 680. The court affirmed Johnson's first degree rape convictions but vacated the assault and kidnapping convictions because

---

[1] First degree burglary is defined in RCW 9A.52.020.

"(1) A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he enters or remains unlawfully in a dwelling and if, in entering or while in the dwelling or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person therein."

[2] First degree rape is defined in RCW 9A.44.040.

"(1) A person is guilty of rape in the first degree when such person engages in sexual intercourse with another person not married to the perpetrator by forcible compulsion where the perpetrator or an accessory:

"(a) Uses or threatens to use a deadly weapon; or

"(b) Kidnaps the victim; or

"(c) Inflicts serious physical injury; or

"(d) Feloniously enters into the building or vehicle where the victim is situated."

those crimes are elements of first degree rape and because the victims had suffered no injury separate and distinct from the rape.

 RCW 9A.44 provides for different degrees of rape. The chapter has been construed as exhibiting a legislative intent not to punish separately those crimes incident to first degree rape when those crimes did not have an independent purpose or effect. *State v. Johnson, supra* at 676.

In *Johnson,* the opinion noted that the existence of the burglary antimerger statute is evidence that the legislature had considered whether additional punishment should be imposed for a crime incidental to another offense. RCW 9A.52.050 provides:

> Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor as well as for the burglary, and may be prosecuted for each crime separately.

The court said:

> If [RCW 9A.52.050] is read with RCW 9A.52.020 and .030, defining burglary in the first and second degrees, it will be seen that, while subsection (1) of .020 includes assault as an element, subsection (1) of .030 involves no other offense. Both, however, have as an element the intent to commit another crime. It would appear, therefore, that RCW 9A.52.050 has reference to such other crimes, rather than to the assault which is an element of first–degree burglary. From the fact that the legislature found this provision necessary, it can be inferred that the legislative assumption was that without it, a question would arise whether such crimes could be punished. If this was the legislative thought with respect to crimes which clearly would not involve multiple punishments, it is not unreasonable to conclude that it was taken for granted that such punishments would be avoided under other sections of the code.

(Footnotes omitted.) *State v. Johnson, supra* at 677.

The burglary antimerger statute controls. We uphold both the first degree rape and first degree burglary convictions. Unlike *Johnson,* where legislative intent was inferred, *see State v. Johnson, supra* at pages 676–77, the anti-

merger statute is an express statement that the legislature intended to punish separately any other crime committed during the course of a burglary.

▮ In addition, the defendant contends that his conviction of first degree rape and first degree burglary constitutes double jeopardy because both offenses stemmed from the same incident. The test for whether conviction of two different offenses for the same incident constitutes double jeopardy is set forth in *Blockburger v. United States,* 284 U.S. 299, 304, 76 L. Ed. 306, 52 S. Ct. 180 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

The "elements of the crimes" test announced in *State v. Roybal,* 82 Wn.2d 577, 582–83, 512 P.2d 718 (1973), is the same as that enunciated in *Blockburger. State v. Swindell,* 93 Wn.2d 192, 195, 607 P.2d 852 (1980).

The same evidence will not convict a defendant of both first degree rape and first degree burglary. Each crime requires proof of a fact that the other does not: first degree rape requires sexual penetration while first degree burglary requires unlawful entry or presence in a dwelling. RCW 9A.44.040; 9A.52.020. The trial court properly refused to give the defendant's requested jury instructions.

## II
### CONFESSION AND CONSENT TO SEARCH

Second, Hoyt argues that his confession and the physical evidence seized pursuant to his written consent to search his apartment should have been suppressed as evidence at trial. He claims that the confession and consent were not voluntary because he was suffering from a mental disorder.

▮ Written findings and conclusions were not entered following the suppression hearing. *See* CrR 3.5(c) (confession); CrR 3.6 (physical evidence). The Supreme Court "has recognized both by rule and decision that knowledge of the

basis for a trial court's ruling or decision is often essential to enable it . . . properly [to] dispose of an appeal." *State v. Agee,* 89 Wn.2d 416, 420, 573 P.2d 355 (1977). Here, we do have the guidance of the oral opinion of the trial court and the testimony of the witnesses at the hearing. Moreover, "when CrR 3.5 has not been observed the appellate court may examine the record and make its own determination of voluntariness." *State v. Vickers,* 24 Wn. App. 843, 846, 604 P.2d 997 (1979); *see State v. Mustain,* 21 Wn. App. 39, 42–43, 584 P.2d 405 (1978).

The record does not reveal, nor does the defendant contend, that the confession and consent to search were the result of police misconduct. He claims only that his mental disorder rendered his confession and consent involuntary. The clinical psychologist and the psychiatrist who testified expressed conflicting opinions about the defendant's ability to make a rational decision to waive his rights. The trial judge's oral opinion indicates that he found the psychologist's testimony more reliable. The psychiatrist saw Hoyt for only 1 hour on June 25, 1979, and he did not review the police officers' report. The clinical psychologist, on the other hand, saw Hoyt when he was admitted to Western State Hospital on April 18 for 15 days of observation. The psychologist testified that, in his opinion, Hoyt voluntarily entered the police station knowing that it was a police station and understood that he was under no compulsion to speak. "The test is whether [the] defendant knew that he had the right to remain silent, not whether he understood the precise nature of the risks of talking." *State v. McDonald,* 89 Wn.2d 256, 264, 571 P.2d 930 (1977). According to the police officers' testimony on April 6, Hoyt was cooperative, pleasant, and "acted and conducted himself like a gentleman." He did, however, have some difficulty with the time elements involved in his stories and periodically would drift from the topic at hand. When his confession was taken on April 7, the defendant was more at ease and had a longer attention span. At no time was he reluctant to speak with the officers.

■ A claim of mental illness does not render a confession inadmissible; rather, it is one factor for the trial court to consider in determining whether a confession was voluntary. *State v. Allen,* 67 Wn.2d 238, 243, 406 P.2d 950 (1965).

> [I]n the absence of an adjudication of insanity or incompetency, and in the absence of any action by the state or its officers which could be said to make a confession involuntary, a confession by a mentally ill defendant should be admissible with the defendant at liberty to introduce evidence of any circumstances that might affect its voluntariness or its probative value.

*State v. Allen, supra* at 242; *see State v. Alvis,* 70 Wn.2d 969, 973, 425 P.2d 924 (1967). We note that at trial Hoyt presented testimony from the psychiatrist concerning his mental state, and the jury was instructed to "give such weight and credibility to any alleged confession or admission of the defendant as you see fit, taking into consideration the surrounding circumstances." A similar instruction was approved in *State v. Allen, supra* at 244.

■ When constitutional rights are involved, we must review the record to determine whether the defendant's right to due process was protected. We need not reevaluate the credibility and reliability of the witnesses. *State v. Hoffman,* 64 Wn.2d 445, 451, 392 P.2d 237 (1964). From our review of the record, we are satisfied that substantial evidence supports the trial court's determination that Hoyt voluntarily confessed and consented to the search of his apartment. Therefore, we hold that the confession and the evidence obtained from the search were admitted properly at trial. *See State v. Burgess,* 71 Wn.2d 617, 618–19, 430 P.2d 185 (1967); *State v. Nesrallah,* 66 Wn.2d 248, 401 P.2d 968 (1965).

### III
#### PHOTOGRAPHIC IDENTIFICATION

Third, Hoyt argues that the victim's out–of–court identification should have been suppressed at trial because she identified him from a photograph of a lineup the day after

she had viewed the lineup and had identified another person as the possible rapist. Hoyt contends that the use of the photograph was unconstitutionally suggestive and contrary to *State v. Thorkelson,* 25 Wn. App. 615, 611 P.2d 1278 (1980).

As with the previous questions, we must review this issue without the benefit of findings and conclusions. *See* CrR 3.6. The trial judge commented that the lineup itself was "remarkably good." He had "never seen one where the individuals . . . looked so much like each other. . . . [E]very single man there, I think, fits the description." The court ruled that the victim's identification of Hoyt from the photograph, following her misidentification the previous day, presented a question of credibility for the jury.

■ Hoyt argues that use of the photograph was unconstitutionally suggestive because (1) it suggested to the victim that she had been wrong in her previous identification and (2) the victim may have been able to identify Hoyt from viewing the lineup. According to her testimony at the pretrial hearing, the victim knew immediately after the lineup that she had identified the wrong suspect; later that day she volunteered that information to the police without any suggestion from them that she had been mistaken. The use of the photograph could not have suggested to the victim that she had been wrong in her previous identification; rather, the photograph was used because she admitted her mistake. A witness may recognize and identify a suspect based on a previous identification procedure rather than the witness' original perception. *See also State v. Hilliard,* 89 Wn.2d 430, 439, 573 P.2d 22 (1977); *State v. Burrell,* 28 Wn. App. 606, 608–09, 625 P.2d 726 (1981). Suggestive identification procedures that create a substantial likelihood of misidentification deny a defendant due process. *Neil v. Biggers,* 409 U.S. 188, 198, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972). We find that the procedure employed in the instant case was not impermissibly suggestive. Nothing in either procedure singled out Hoyt; the lineup itself was "remarkably good" and each person in the lineup appeared

in the photograph.

Hoyt also relies on *State v. Thorkelson* in his argument that the identification should have been suppressed. *Thorkelson* held that "absent extenuating circumstances, photographic identification procedures of an in–custody defendant should not be used." *State v. Thorkelson, supra* at 619. Hoyt contends that a lineup was the only permissible method of identification. *Burrell* observes that "the procedure by which identification evidence is obtained is not so determinative of its reliability that a per se rule of exclusion for photographic identifications is appropriate. Insofar as *Thorkelson* may suggest a per se rule of exclusion, we modify its holding." *State v. Burrell, supra* at 610. We hold that the use of the photograph of the lineup was not impermissibly suggestive and that the out–of–court identification was admitted properly at trial.

The judgment is affirmed.

WILLIAMS and ANDERSEN, JJ., concur.

Reconsideration denied June 10, 1981.

Review denied by Supreme Court September 3, 1981.