[No. 11268–6–I.   Division One.   May 2, 1983.]

THE STATE OF WASHINGTON, *Respondent,* v. EDWARD PETER NICHOLAS, JR., *Appellant.*

*John Wolfe,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Linda Walton, Deputy,* for respondent.

RINGOLD, J.—Edward Peter Nicholas, Jr., appeals the judgment and sentence entered on his conviction by a jury of one count of burglary in the first degree (RCW 9A.52-.020) and one count of rape in the first degree (RCW 9A.44.040). We affirm.

On January 5, 1981, the victim, Ms. S., was awakened by an intruder in her house. He was wearing a sweatshirt with the hood over his head and it was dark, so she could not see his face. He proceeded to have forcible intercourse with her. At one point during the rape Ms. S. said "Is it Peter?" referring to the defendant, who lived nearby and had done yard work for her the previous summer. The rapist did not respond to her question, and fled from the house. Ms. S. reported the rape to the police, who investigated but did not develop any suspects.

On June 25, 1981, Ms. S. was again raped in her bed by an intruder. She tried to push him away with her hands on his face and chest. After he fled, she notified the police and described the rapist as slender and muscular, with short

curly hair and an odor of sweat mixed with cologne. He was wearing two layers of clothing, "like a T–shirt with a shirt over it or a jacket over it." Ms. S. felt that the January and June rapes had been perpetrated by the same person.

K.C., a police dog, picked up a scent on the bushes near the victim's house, but lost it at a nearby street intersection. K.C. picked up a scent again on the other side of the intersection after hunting for a while. The dog and Officer Kummerfeldt, his handler, ran down the street into a school yard, where they found Nicholas. K.C. indicated that it was Nicholas' scent he was following. Kummerfeldt described Nicholas as extremely sweaty and red–faced, and as apparently having an erection.

Officer Hambly, who took Nicholas into custody after K.C. found him, testified that Nicholas was sweating profusely and had an erection. Nicholas also had two small fresh scratches on his face, characterized by Officer Hambly as "fingernail scratches." Nicholas was wearing "dirty tennis shoes, a blue, very baggy T–shirt type of affair, and blue jeans." He was not wearing socks or underwear.

After being advised of his rights, Nicholas related his version of events to the police. He had received the scratches earlier that day, when he had fallen into some bushes off a ladder while housepainting; he had been drinking at a local tavern earlier in the evening, had walked home and then to a friend's house; the friend was not home, so he had been returning to his house when he stepped into the school yard to urinate, and K.C. came up to him; he was sweaty because he had been running. After arresting Nicholas, the police searched his residence. Nicholas' mother gave them a sweatshirt of his which was similar to that worn by the January rapist.

Laboratory tests were performed on fingernail scrapings and a vaginal smear taken from Ms. S., for comparison with Nicholas' blood type. The fingernail scrapings proved to contain human blood, but in insufficient quantities to type. The vaginal smear contained sperm, though Ms. S. stated she did not know whether her assailant ejaculated. An acid

phosphatase test showed positive for a type O secretor which meant, since Ms. S. is a type O secretor, that the rapist was either a type O secretor or a nonsecretor, categories covering about 60 percent of the population. Blood tests showed that Nicholas was a type A nonsecretor, so he was not ruled out by the acid phosphatase test. No legible fingerprints were obtained from a pair of sunglasses which had been left by the assailant at the scene of the June rape.

Nicholas was charged with one count of first degree rape and one count of first degree burglary arising from the June 25 rape. Another count of first degree rape and another count of first degree burglary with respect to the January 5 rape were subsequently added by amendment. The charges were tried to a jury, which found Nicholas guilty of the charges dealing with the June 25 incident and not guilty of the charges relating to the January 5 incident.

## SUFFICIENCY OF THE EVIDENCE

Nicholas first contends that tracking dog evidence is legally insufficient to provide proof of identity beyond a reasonable doubt, that under the recent case of *State v. Loucks,* 98 Wn.2d 563, 656 P.2d 480 (1983), there must be independent substantial evidence of identity sufficient to satisfy the standard of *State v. Green,* 94 Wn.2d 216, 616 P.2d 628 (1980), and that such evidence is lacking.

In *Loucks,* the Supreme Court recognized that police dogs cannot be conclusively relied on to follow the trail of one individual if other human trails have crossed or even have come near the one being followed. The court held that while tracking dog evidence may be admitted following the laying of a proper foundation, *State v. Socolof,* 28 Wn. App. 407, 623 P.2d 733 (1981), such evidence by itself is legally insufficient to prove identification. The *Loucks* court held that the dangers inherent in the use of tracking dog evidence can only be alleviated by the presence of corroborating evidence identifying the accused as the perpetrator of the crime.

Although the *Loucks* court did not articulate the stand-

ard of appellate review for determining the sufficiency of the corroborating evidence, the court reversed Loucks' conviction for lack of such evidence. The fact that Loucks had been found by the dog in the vicinity of the burglary and had told police he was looking for a friend who lived in another part of the city was insufficient to corroborate the tracking dog; the court said such evidence was "susceptible to too many constructions to constitute evidence of his complicity in the . . . burglary." *Loucks,* at 568.

■ The rule urged by Nicholas, that the corroborating evidence required under *Loucks* must be sufficient by itself to satisfy the *Green* standard, would go beyond the holding in *Loucks* and would in effect make tracking dog evidence *inadmissible* absent such corroborating evidence. Nicholas concedes, however, that a proper foundation was made for admitting the tracking dog evidence. Once ruled properly admissible the tracking dog evidence, albeit insufficient to convict by itself, must be considered along with all of the other evidence of identity in determining under *Green* whether there was substantial evidence to convict. The test then becomes whether all of the evidence of identity, including that of the tracking dog, and the reasonable inferences to be drawn therefrom, when viewed in the light most favorable to the State, is sufficient to permit a rational trier of the fact to find beyond a reasonable doubt that Nicholas was the perpetrator of the June 25 rape and burglary. *State v. Green, supra.*

Nicholas fit the victim's description of the rapist. He was extremely sweaty. He was reasonably close to the victim's residence and he was not excluded from consideration by the medical tests. He had fresh bleeding cuts on his cheek and nose and a scratch on the other side of his nose. Fingernail scrapings taken from the victim contained human blood. This evidence, taken together with the tracking dog identification, was sufficient to satisfy the standard of *State v. Green, supra.*

## ADMISSIBILITY OF MEDICAL TEST RESULTS

Nicholas next contends that the results of the secretor type tests had no relevance to the issue of identity, and established only that the sperm could have come from 60 percent of the population. He argues that the test results merely tended to include him in a class of people who might have committed the rape, "thereby increas[ing] the probability of defendant's guilt without connecting him, in any way, to the charged offense." *People v. Sturdivant,* 91 Mich. App. 128, 131, 283 N.W.2d 669, 670 (1979). He urges this court to follow the *Sturdivant* case and hold that the testimony was prejudicial and irrelevant and should have been excluded.

*People v. Sturdivant, supra,* holds irrelevant secretor test results which merely place the defendant in a category of people who might have committed the crime. *Sturdivant* has subsequently been disapproved by other panels of the Michigan court, *see, e.g., People v. Camon,* 110 Mich. App. 474, 313 N.W.2d 322 (1981); *People v. Horton,* 99 Mich. App. 40, 297 N.W.2d 857 (1980), and even the author of the *Sturdivant* opinion has subsequently qualified his holding in that case by saying that the test is one of balancing probative value with prejudicial effect, not a rule of irrelevance per se. *See People v. White,* 102 Mich. App. 156, 301 N.W.2d 837, 839 (1981) (Kelly, J., concurring); *see also* Annot., 46 A.L.R.2d 1000.

In *State v. Luoma,* 88 Wn.2d 28, 558 P.2d 756 (1977), the court held that the evidence the victim's blood type matched bloodstains found in the defendant's car had probative value, and was admissible; that an objection goes to the weight and not the admissibility of the evidence. Similarly, evidence which tends to limit the field of possible perpetrators is relevant on the issue of identity. The results of the acid phosphatase and secretor type tests tended to some degree to make it more probable that Nicholas was guilty of the rape and burglary. ER 401. Nicholas nowhere alleges prejudice which would merit exclusion of this evidence pursuant to ER 403. The probative value of the evi-

dence or the lack thereof could be argued to the jury. The evidence was properly admitted.

## ALLEGED INCONSISTENCY OF JURY VERDICTS

Nicholas next contends, citing *State v. O'Neil,* 24 Wn.2d 802, 167 P.2d 471 (1946), that the jury verdicts, finding that he committed the June 25 rape but not the January 5 rape, are inconsistent because all of the charged crimes required proof of the same elements. He bases this contention on (1) the fact that the amended information stated that the June 25 crimes were "of the same or similar character as [the January 5 crimes], which were part of a common scheme or plan"; (2) the victim's testimony that the two rapes were committed by the same individual; and (3) the State's argument that the two incidents were part of a common scheme or plan. Nicholas argues that since it was uncontroverted that one person committed all of the crimes, the element of identity was therefore common to all four counts and the jury should have been required to reach the same verdict as to all the counts.

In *State v. O'Neil, supra* at 809, the Supreme Court stated,

> What constitutes inconsistency depends upon the particular circumstances. If the crimes charged in separate counts are composed of different elements, a verdict of acquittal on one ordinarily is not inconsistent with a verdict of guilty on another. But where, as in the instant case, two offenses growing out of the same transaction are charged in separate counts of an indictment or information, and one offense includes elements or acts necessary to the commission of the other offense, a verdict of acquittal of the one is inconsistent with a verdict of guilty of the other.

(Citations omitted.) While the charges for the January 5 rape and burglary are the same statutory offenses as those for the June 25 crimes, the facts underlying the crimes are different. The offenses took place on different dates and the evidence admitted to prove the charges differed for each date. A verdict of not guilty as to the January 5 charges

implies nothing as to Nicholas' guilt of the June 25 crimes. The verdicts were not inconsistent. *See State v. Fairfax,* 42 Wn.2d 777, 258 P.2d 1212 (1953); *State v. Brooks,* 30 Wn. App. 280, 633 P.2d 1345 (1981).

## MERGER OF RAPE AND BURGLARY CONVICTIONS

Finally, Nicholas contends that the State may not doubly enhance the sentence of a defendant who has been convicted of two crimes arising from a single criminal transaction, citing *State v. Johnson,* 92 Wn.2d 671, 600 P.2d 1249 (1979).

*State v. Hoyt,* 29 Wn. App. 372, 628 P.2d 515 (1981) is controlling. There the court held that the burglary anti-merger statute, RCW 9A.52.050,[1] "an express statement that the legislature intended to punish separately any other crime committed during the course of a burglary", precludes the merger of convictions for first degree rape and first degree burglary. *Hoyt,* at 378.

The judgment and sentence is affirmed.

DURHAM, A.C.J., and CALLOW, J., concur.

Reconsideration denied June 9, 1983.

Review denied by Supreme Court August 12, 1983.

---

[1] RCW 9A.52.050 provides,

"Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor as well as for the burglary, and may be prosecuted for each crime separately."