PEOPLE v GOREE

Docket No. 56266. Submitted June 28, 1982, at Grand Rapids.—Decided March 20, 1984.

Brady Goree was convicted of both premeditated and felony murder by a jury in Kent Circuit Court, Robert A. Benson, J. Defendant appeals, contending that the trial court erred in admitting similar-acts testimony and in admitting blood-typing evidence and that his convictions for both premeditated and felony murder constitute double jeopardy. *Held:*

1. The trial court did not err in admitting the challenged similar-acts testimony.

2. The trial court did not err in admitting the blood-typing evidence.

3. A defendant may not be sentenced to two concurrent terms of life imprisonment for premeditated murder and felony murder for a single killing without violating the constitutional prohibition against double jeopardy. The defendant's conviction for premeditated murder is vacated and the conviction for felony murder is affirmed.

Affirmed in part, vacated in part.

M. J. KELLY, J., concurred with the majority's refusal to find abuse of discretion in the trial court's admission of the blood-type evidence and with the resolution of defendant's double jeopardy claim but dissented on the issue of the admission of

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence § 249 *et seq.*
[2] 5 Am Jur 2d, Appeal and Error §§ 772-775, 881.
[3] 30 Am Jur 2d, Evidence § 1080.
[4, 10] 29 Am Jur 2d, Evidence § 370.
  30 Am Jur 2d, Evidence § 1104.
  Admissibility, weight, and sufficiency of blood-grouping tests in criminal cases. 2 ALR4th 500.
[5] 29 Am Jur 2d, Evidence §§ 320, 333.
[6] 29 Am Jur 2d, Evidence § 320 *et seq.*
[7, 8] 29 Am Jur 2d, Evidence § 322.
[9] 40 Am Jur 2d, Homicide §§ 72, 183 *et seq.*
  Application of felony-murder doctrine where the felony relied upon is an includible offense with the homicide. 40 ALR3d 1341.

the similar-acts testimony. He would reverse on that issue since he was not persuaded that the charged offense and the similar act share a high degree of similarity or are marked with special characteristics so uncommon, peculiar, and distinctive as to lead compellingly to the conclusion that both were the handiwork of the defendant.

## OPINION OF THE COURT

1. EVIDENCE — PREJUDICE — RULES OF EVIDENCE.

Evidence having any tendency to make a consequential fact more or less probable is relevant and generally admissible but may be excluded where its probative value is substantially outweighed by, among other things, the danger of unfair prejudice (MRE 401-403).

2. EVIDENCE — PROBATIVE VALUE — PREJUDICE.

The determination of whether or not the probative value of evidence is substantially outweighed by its unfairly prejudicial effect rests within the discretion of the trial court and will not be disturbed on appeal unless the reviewing court is persuaded that there has been an abuse of that discretion.

3. EVIDENCE — PROBATIVE VALUE.

Probative value of evidence means more than simply relevance; if relevance is the tendency of evidence to make more or less probable the existence of a consequential fact, probative value is a measure of the strength and force of that tendency.

4. EVIDENCE — BLOOD-TYPE EVIDENCE — PROBATIVE VALUE.

The probative value of blood-typing evidence is almost entirely dependent upon the size of the class of possible perpetrators; the smaller the class, the more compelling the inference that the defendant as a member of it was the source of the sample.

5. CRIMINAL LAW — EVIDENCE — SIMILAR ACTS.

Evidence of similar crimes, wrongs, or acts committed by a defendant is generally not admissible to prove the defendant's bad character and, through it, guilt of the charged offense; such evidence is excluded because of the perceived danger that the defendant's character as a bad man will divert the trier of fact from an objective appraisal of the defendant's claimed conduct; however, similar-acts evidence may be admissible in limited circumstances to prove other specifically identified conditions and facts and, through them, guilt of the charged offense.

6. CRIMINAL LAW — EVIDENCE — SIMILAR ACTS.

Evidence of a similar act may be admitted where: (1) there is substantial evidence that the defendant in fact committed the alleged similar act; (2) there is some special quality or circumstance of the similar act tending to prove motive, opportunity, intent, preparation, scheme, plan, or a system in doing an act, knowledge, identity, or absence of mistake or accident; (3) one or more of these factors is material to the determination of the defendant's guilt of the charged offense; and (4) the probative value of the similar-act evidence is not substantially outweighed by the danger of unfair prejudice.

7. CRIMINAL LAW — EVIDENCE — SIMILAR ACTS — IDENTITY OF PERPETRATOR.

A trial court, when similar-acts evidence is offered to prove identity, should insist upon a showing of a high degree of similarity in the manner in which the crime in issue and the other similar acts were committed; the prosecution must show that the manner in which the crime charged and the other similar acts were committed was marked with special characteristics so uncommon, peculiar, and distinctive as to lead compellingly to the conclusion that all were the handiwork of the defendant because all bore his distinctive style or touch.

8. CRIMINAL LAW — EVIDENCE — SIMILAR ACTS — IDENTITY OF PERPETRATOR.

Evidence of similar acts offered for the purpose of proving the identity of the perpetrator of the crime charged should only be admitted where the trial court is persuaded that there is little or no danger that the jury, aided by a limiting instruction, will misconstrue the proper purpose of the evidence or jettison reason in favor of passion in assessing the defendant's guilt or innocence of the crime charged.

9. CRIMINAL LAW — PREMEDITATED MURDER — FELONY MURDER — DOUBLE JEOPARDY.

A defendant may not be sentenced to two concurrent terms of life imprisonment for premeditated murder and felony murder for a single killing without violating the constitutional prohibition against double jeopardy.

PARTIAL CONCURRENCE AND PARTIAL DISSENT BY M. J. KELLY, J.

10. CRIMINAL LAW — EVIDENCE — BLOOD-TYPE EVIDENCE.

*The admissibility of blood-type evidence which places a defendant*

*among 12% of the population sharing the victim's blood-type is best left to the discretion of the trial court.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *David H. Sawyer,* Prosecuting Attorney, *Carol S. Irons,* Chief Appellate Attorney, and *David M. Schieber,* Assistant Prosecuting Attorney, for the people.

*George S. Buth,* for defendant on appeal.

Before: R. M. MAHER, P.J., and M. J. KELLY and R. L. TAHVONEN,* JJ.

R. L. TAHVONEN, J. Brady Goree was convicted by a jury of both premeditated and felony murder arising out of the death of Janice Kahn on February 20, 1980. He appeals as of right.

Mr. Goree claims that (1) the trial court erred in admitting "similar acts" testimony, (2) the trial court erred in admitting "blood-typing" evidence, and (3) his convictions for both premeditated and felony murder constitute "double jeopardy".

We conclude that the trial court did not abuse its discretion in admitting the challenged similar-acts and blood-typing evidence but that the defendant's double jeopardy claim is well-founded. Accordingly, we affirm the felony-murder conviction and vacate the premeditated murder conviction.

Analysis of the legal issues before us requires a clear understanding of the evidence introduced at trial.

On February 20, 1980, at about 1:15 in the afternoon, Janice Kahn was found shot to death in the back of the Prism Shop in Grand Rapids. Ms. Kahn had been shot in the head while kneeling or stooping. Her hair was disarrayed in a manner

---

* Circuit judge, sitting on the Court of Appeals by assignment.

indicating that it had been grabbed or held during or before the firing of the fatal shot. The victim's skirt was raised above her waist, her shoes and panty hose were found next to her body and semen was found on her thigh and skirt. The autopsy revealed no other signs of sexual assault.

A police crime technician testified that there was no money in the cash drawer after the murder, although the shop's owner stated that there was at least $50 in the register as of 10 o'clock that morning. A receipt lying on the rear counter in the store was made out to "John Smith" of "1922 Greenville Drive, Grand Rapids". No significant fingerprints were found on the receipt or elsewhere in the shop.

There is no road or street by the name of "Greenville Drive" in either the City of Grand Rapids or in Kent County. However, an employee of a local car dealership testified that defendant filled out a credit application for an automobile on February 14, 1980 (six days before the murder), listing his nearest relative as "Shirlene Smith" of "Greenville Drive". Defendant's sister, Shirlene Smith, does live on Greenview Drive, which is a street in Kent County. Defendant's grandmother accompanied him to the dealership on the 14th, but contended that Smith's address had been correctly given as Greenview Drive.

After the murder, the shop's owner found one $40 lamp in the layaway area; the "John Smith" receipt indicated that a deposit of $10 had been made on the lamp.

Several witnesses placed defendant in or near the store between the hours of 10:40 a.m. and 1 p.m. on the day of the murder.

Norma VanKuiken testified that she was in the store from 10:40 a.m. to 11:10 a.m. on February 20

and that while she was there defendant came in and talked to the victim for ten minutes. Defendant purchased nothing, although he displayed a $10 bill and Kahn told him to come back later.

Ernestine Maze, a neighbor and acquaintance of defendant, testified she saw defendant several times on February 20 while she was in downtown Grand Rapids for a dentist appointment. She first saw defendant about 11:30 a.m. before she had some teeth pulled. At about 12:15 p.m. Ms. Maze left the dentist's office and shopped for an hour. She saw defendant again and spoke with him briefly. The third time Ms. Maze saw defendant was on a return trip home while she was in a cab. At about 1:30 p.m. she saw defendant downtown walking toward Division Street. Ms. Maze's cabdriver, Mr. John Feutz, testified that his daily log reflected picking up Ms. Maze at about 1:30 p.m. on February 20 at a downtown Revco store. Mr. Feutz recalled Ms. Maze saying, "I know that man" about someone she saw while the cab waited at a traffic signal around Fulton and Division Streets.

Miguel Berrios testified that he had known the defendant for several months prior to February 20 and had met with him at his downtown Grand Rapids office between 11 and 11:30 a.m. on that date.

Elsa Kerr and Chantell Milligan were in the Prism Shop on their lunch hour from 12:20 to 12:40 p.m. and saw Ms. Kahn in the shop waiting on a woman customer. Renee Kosprzak, present in the store from 12:55 p.m. to 1 p.m., saw no one.

Fred Johnson, an acquaintance of defendant's, saw him walking on Ionia Street just in front of the Prism Shop sometime between 12:55 p.m. and 1 p.m.

The examining pathologist testified that Ms. Kahn died of a contact gunshot wound to the top of her head. During the course of the autopsy, the pathologist removed dried semen from the Victim's upper right thigh and said he believed semen stains were on her skirt. No semen was found in any body cavity and there were no findings of trauma indicative of forced penetration. At the scene, the blood splatter pattern suggested that the victim was shot while kneeling, bending, or stooping over. Bruising of skin over the kneecap was consistent with the suggestion that she was kneeling. Her hair was disarrayed in a manner indicating it had been grabbed or held. Testimony from a police officer was to the effect that Ms. Kahn had been killed by a .38 or .357 caliber handgun.

The challenged "bloodtyping" evidence consisted of the testimony of Glen Moore, a qualified crime laboratory technician. Mr. Moore told the jury that blood serology analysis revealed:

(1) That the semen found on the victim's skirt came from a non-secretor, PGM type 1.

(2) That defendant is a non-secretor, PGM type as are 12% of the population, and could have been the source of the semen.

(3) That the victim's husband could not have been the source (he is PGM type 2).

The "similar acts" evidence consisted of the testimony of Kathy Blanchard, who worked in downtown Grand Rapids at the Wigwam Shoppe on South Division Street. On January 14, 1980, at about 10:30 a.m. while Ms. Blanchard was clerking in the store alone, defendant came in to buy a wig. As Ms. Blanchard was about to write defendant a receipt, he pulled a gun out and forced Ms. Blanchard to put the money from the cash register

in a bag. At gunpoint, defendant ordered Ms. Blanchard to go to the back of the store. Defendant told Ms. Blanchard to remove her boots and panty hose, which she did. He then made Ms. Blanchard lie on her back on the floor with her skirt raised up. Defendant unzipped his pants and exposed his penis. Defendant next forced Ms. Blanchard to move in a variety of positions, first on her stomach and then on her knees. While she kneeled, defendant placed something around Ms. Blanchard's neck and choked her until she passed out. When Ms. Blanchard revived, her boss had returned and defendant was gone. Ms. Blanchard testified that she believed the gun the defendant had at the time was small, perhaps .22 caliber.

Although the defendant elected not to testify, the defense did present an alibi defense based upon testimony that defendant was at his sister's house from 12 to 12:30 p.m. and at 2:15 p.m. on February 20, 1980.

The jury convicted defendant of both premeditated and felony murder.

### BLOOD-TYPING EVIDENCE

The trial court permitted the prosecutor to introduce blood-typing evidence including the defendant among 12% of the male population that could have been the source of the semen found on the decedent's thigh and skirt and excluding the decedent's husband as a possible source. Defense counsel's specific and timely objection preserved this issue for our review.

Panels of this Court differ on the admissibility of blood-typing evidence offered to include a particular defendant among a class of serologically possible perpetrators. Compare *People v Sturdivant,* 91

Mich App 128; 283 NW2d 669 (1979), *lv den* 407
Mich 933 (1979), with, for example, *People v Ca-
mon,* 110 Mich App 474; 313 NW2d 322 (1981).
Until our Supreme Court authoritatively speaks to
the question, perhaps further analysis at this level
appears superfluous. But our duty to provide a
principled decision in this case requires that we
state plainly our views on this divisive issue.

Evidence having any tendency to make a conse-
quential fact more or less probable is relevant,
MRE 401, and generally admissible, MRE 402, but
may be excluded where its probative value is
substantially outweighed by, among other things,
the danger of unfair prejudice, MRE 403.

Whether or not Mr. Goree was the source of the
semen found on the decedent's thigh and skirt is a
consequential fact, *i.e.,* a ·"fact that is of conse-
quence to the determination of the action". MRE
401. Evidence that the defendant is among only
12% of the male population that *could* have been
the source *tends* to make it *more probable* that he
*was* the source. Such evidence is therefore rele-
vant. MRE 401.

There is no constitutional provision, statute,
court rule, or rule of evidence that bars introduc-
tion of such evidence in a case of this nature. It is
therefore generally admissible. MRE 402.

The Michigan Rules of Evidence recognize that
even this otherwise admissible blood-typing evi-
dence should be excluded by the trial court if the
judge finds that its probative value is substantially
outweighed by, among other things, the danger of
unfair prejudice to the defendant. MRE 403. This
weighing of the contribution the proposed evidence
will make in the fact-finding process against the
danger that the outcome will be affected by im-
proper considerations is committed to the discre-

tion of the trial court. The balance struck by the trial court will not be disturbed on appeal unless the reviewing court is persuaded that there has been an abuse of that discretion. *People v Castillo,* 82 Mich App 476; 266 NW2d 460 (1978).

Probative value means more than simply relevance. If relevance is the tendency of evidence to make more or less probable the existence of a consequential fact, probative value is a measure of the strength and force of that tendency. In blood-typing cases, evidence that the defendant shares the identifying characteristic with 2.7% of the population has a greater tendency to establish the consequential fact than evidence that the defendant shares the characteristic with 25.0% of the population. The strength of this connection between the proposed evidence and the consequential fact must be assessed *in each case* on the basis of logic, common experience, and shared assumptions regarding human behavior. It is particularly and peculiarly a task for the trial judge.

Under MRE 403, the trial court having considered the probative value of the evidence must determine whether that value is substantially outweighed by the danger of unfair prejudice. We are quick to dispense with the recurrent notion that evidence should be excluded under MRE 403 because it simply "prejudices" the cause of the objecting party. Obviously, evidence is offered by an advocate for the always clear, if seldom stated, purpose of "prejudicing" the adverse party. Recognizing this, the Supreme Court in adopting MRE 403 identified only *unfair* prejudice as a factor to be weighed against probative value. This unfair prejudice refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to

the merits of the lawsuit, *e.g.,* the jury's bias, sympathy, anger, or shock.

The question with regard to blood-typing evidence becomes: Where is the unfair prejudice? The only specific suggestion in case law is that there exists the danger that the probative value of blood-typing evidence will be artificially inflated by the prestige of the witnesses called to the stand to introduce it. As Judge KELLY observed in *People v White,* 102 Mich App 156, 166; 301 NW2d 837 (1980):

"[T]he evidence perhaps assumes an aura of authenticity if presented through persons with scientific credentials in theoretical white smocks".

This, of course, is a legitimate concern. Yet it is far from the kind of unfair prejudice implicit, for example, in the frequent use of gruesome photographs in murder or assault cases. Moreover, we are willing to assume that proper cross-examination, argument, instructions by the court and the jury's common sense can distinguish between the message and the messenger.

In short, the probative value of blood-typing evidence is almost entirely dependent upon the size of the class of possible perpetrators. The smaller the class, the more compelling the inference that the defendant as a member of it was the source of the sample. The danger of unfair prejudice stems almost entirely from the possibility that the factfinders would give greater weight to the evidence than is statistically warranted because of the impressive credentials of those who are called to present it. The trial court's discretionary determination as to whether to admit or exclude blood-typing evidence depends upon a consideration of these, among other factors. We are satisfied that,

in this case, the defendant has not established that
the trial judge abused his discretion in choosing to
admit evidence including this defendant among
12% of the population that could serve as the
source of the semen.

## SIMILAR-ACTS EVIDENCE

Defendant next contends that he was denied a
fair trial by admission of evidence of the assault
upon Kathy Blanchard.

Evidence of similar crimes, wrongs, or acts com-
mitted by a defendant is generally not admissible
to prove the defendant's "bad character" and,
through it, guilt of the charged offense. *People v
DerMartzex,* 390 Mich 410; 213 NW2d 97 (1973).
Such evidence is excluded because of the perceived
danger that the defendant's character (as a "bad
man") will divert the trier of fact from an objec-
tive appraisal of the defendant's claimed conduct
(the charged offense). *People v Matthews,* 17 Mich
App 48; 169 NW2d 138 (1969).

As an exception to this general rule, similar acts
evidence may be admissible in limited circum-
stances to prove other specifically identified condi-
tions and facts and, through them, guilt of the
charged offense.

MRE 404(b) sets forth both the rule and its
exceptions:

"Evidence of other crimes, wrongs, or acts is not
admissible to prove the character of a person in order
to show that he acted in conformity therewith. It may,
however, be admissible for other purposes, such as proof
of motive, opportunity, intent, preparation, scheme,
plan, or system in doing an act, knowledge, identity, or
absence of mistake or accident when the same is mate-
rial, whether such other crime, wrongs or acts are

contemporaneous with, or prior or subsequent to the crime charged."

In *People v Golochowicz,* 413 Mich 298; 319 NW2d 518 (1982), the Supreme Court had occasion to review at length the general rule precluding admission of similar-acts evidence and its limited exceptions. In that case, the Court held that admission of evidence of a separate uncharged murder was prejudicially unfair to the defendant. The Court held that before evidence of similar acts may be admitted as an exception to the general rule, the four requirements set forth in *People v Wilkins,* 82 Mich App 260; 266 NW2d 781 (1978), *rev'd on other grounds* 408 Mich 69; 288 NW2d 583 (1980), must all be met. Specifically, there must be:

(1) substantial evidence that the defendant in fact committed the alleged similar act;

(2) some special quality or circumstance of the similar act tending to prove motive, opportunity, intent, preparation, scheme, plan, or a system in doing an act, knowledge, identity, or absence of mistake or accident;

(3) one or more of these factors must be material to the determination of the defendant's guilt of the charged offense; and

(4) the probative value of the similar-act evidence must not be substantially outweighed by the danger of unfair prejudice.

In the present case, the first requirement—the identity of the defendant as the perpetrator of the similar act—is satisfied. Prior to the trial now before us on appeal, the defendant was convicted of the assault upon Kathy Blanchard. Thus, of necessity, his identity as the perpetrator of that prior assault has been established beyond a rea-

sonable doubt. Proof beyond a reasonable doubt certainly constitutes substantial evidence of identity.

As in *Golochowicz,* the second requirement presents a close question, *i.e.,* the degree of similarity between the prior act and the crime for which the defendant stood trial.

The prosecution has the obligation of showing that the circumstances of the commission of the crime charged and the prior act are so similar and unique as to suggest the "signature" of a single actor, the defendant. The *Golochowicz* Court emphasized that

"the trial court, when similar-acts evidence is offered to prove *identity,* should insist upon a showing of a high degree of similarity in the manner in which the crime in issue and the other crimes were committed. We regard the requirement to be a heavy burden upon the prosecution to show that the manner in which the crime charged and the other crimes were committed was marked with special characteristics so uncommon, peculiar and distinctive as to lead compellingly to the conclusion that all were the handiwork of the defendant because all bore his distinctive style or 'touch'." *Golochowicz, supra,* p 325 (emphasis in original).

We are convinced that the trial court here could properly conclude that the two crimes bore the requisite distinctive similarities to point compellingly to defendant as their common perpetrator. Both women were white shopkeepers about the same age. Their stores were only two blocks apart and both crimes occurred within a five-week period. Both women first encountered defendant at approximately 10:30 a.m. or 11 a.m. while their shops were open and they were working alone. The defendant originally pretended he was going to buy something from Ms. Blanchard and she

even started to make out a receipt; while at the Prism Shop, both copies of a "John Smith" of "Greenville Drive" receipt were found on the counter-top. Both times, the assailant used a gun to commit the robbery. Defendant told Ms. Blanchard to remove her shoes and panty hose and then forced her to lie on her back and lift her skirt above her pubic area. Ms. Kahn was found with her skirt above her waist, nude from the waist down, with her shoes and panty hose next to her body. Blanchard testified that defendant exposed his penis. Semen was found on Ms. Kahn's thigh and skirt. In neither case was there any indication of forced penetration. Both assaults occurred at gunpoint at the back of the shops. Defendant forced Ms. Blanchard to her knees before trying to kill her by strangulation. Blood spatters at the Prism Shop demonstrated that Ms. Kahn was shot while kneeling.

The third *Golochowicz* requirement—that the fact the similar-acts evidence is offered to prove is genuinely controverted—is likewise satisfied. The identity of Janice Kahn's killer was the pivotal factual issue at trial, particularly in light of defendant's claim of alibi. At a day-long hearing held to determine the admissibility of evidence regarding the Blanchard assault, the prosecutor specifically stated that such evidence was offered on the issue of identity. It was for this purpose that the trial court admitted the evidence. The question of identity was material in the sense that it was genuinely at issue and in controversy.

The fourth and final question to be determined is whether the probative value of the similar-acts evidence was substantially outweighed by the danger of unfair prejudice. As noted earlier, *Golochowicz* emphasized that where similar-acts evi-

dence is offered to prove *identity* the trial court
should be particularly sensitive to the danger of
unfair prejudice. It is well to recall that the con-
viction in *Golochowicz* was reversed not because
the crimes were too dissimilar, but rather because
"the evidence of the uncharged homicide was so
unfairly prejudicial when weighed against its lim-
ited and tenuous probative worth that, in its ad-
mission, the defendant was denied a fair trial."
*Golochowicz, supra,* p 323.

The "overriding policy" of protecting the ac-
cused from unfair prejudice requires that "the
presumptive direction of the trial court's exercise
of discretion should be toward excluding the evi-
dence." *Golochowicz, supra,* p 326. Such evidence
should only be admitted when the trial court is
persuaded that there is little or no danger that the
jury, aided by a limiting instruction, will miscon-
strue the proper purpose of the evidence or jetti-
son reason in favor of passion in assessing the
defendant's guilt or innocence of the crime
charged.

The danger of unfair prejudice is so great and
the presumption against admission so strong that
there are few cases where similar-acts evidence
would be properly admissible to establish identity.
In fact, a prosecutor who offers such evidence for
that purpose is firmly impaled on the horns of the
proverbial dilemma. The *Golochowicz* Court noted:

"As a general rule, if the evidence of the accused's
identity as the perpetrator of the crime in question is
strong or essentially uncontroverted, there is no need
for evidence of other crimes to prove identity, which
evidence is only circumstantial at best. On the other
hand, if evidence of the identity of the criminal actor is
weak or tenuous, revelation that he has committed an
unrelated similar crime may, by reason of its tendency

to distract the jury from the identification issue, tempt it to compromise or ignore that critical element of the case while focusing on the clearer proof of the defendant's other misconduct. The dangerous result may well be, and indeed is likely to be, the jury's conclusion that whatever the strength of the identification evidence in the case, the defendant is demonstrably a bad person and should be imprisoned anyway." *Golochowicz, supra,* p 325.

In short, if the prosecutor has a strong case on identity, similar-acts evidence should be excluded as unnecessary. If the prosecutor has a weak case on identity, similar-acts evidence should be excluded because it may be distracting and unfairly prejudicial.

Assuming there are cases in which a trial court does not abuse its discretion in admitting similar-acts evidence on the issue of identity, we are persuaded this is one of them.

The trial court in this case could properly conclude that evidence of the Blanchard assault was compellingly probative on the question of identity. The peculiar and unique similarities between the two assaults were such as to suggest that each was the act of the same individual. Thus, the probative value of the disputed evidence was substantial.

Further, this was not a case where the prosecution could clearly establish or attempt to establish identity without the use of the disputed similar-acts evidence. In fact, the prosecution's entire case was circumstantial and the similar-acts evidence was an important strand in the cable of circumstantial evidence used to support the prosecution's case against the defendant.

Nonetheless, there were other, distinct strands of circumstantial evidence and the prosecutor did not rely upon similar-acts evidence alone to sup-

port the claim made against the defendant. Several witnesses placed the defendant in or near the crime scene on the morning of the killing and within minutes if its occurrence. Serological tests included the defendant within 12% of the population who could have served as the source of the semen found on the decedent's thigh and skirt. The "John Smith" receipt found at the murder scene was arguably linked to the defendant.

Moreover, the trial judge in this case repeatedly and correctly instructed the jury as to the limited use of the similar-acts evidence. After the testimony of Kathy Blanchard, the trial judge told the jury:

"Mr. Goree is not on trial here and is not presently being tried for anything that happened to Miss Blanchard. The testimony that has been allowed in is for the sole purpose of establishing the identity of Mr. Goree as the person who perpetrated the crime against Miss Blanchard which he is not on trial for.

"The prosecutor will try to argue to you that because of the similarity between the crimes that Mr. Goree may have committed both of them. You are going to be the sole judges of those facts and the prosecutor is going to have to convince you of that fact beyond a reasonable doubt. I want to caution you from drawing any conclusions on that that Mr. Goree did this, because he may be considered a bad man or you may not like his actions, or because he did something to Miss Blanchard that for that reason alone you can find him guilty of doing something against Janice Kahn for which he is on trial here. Again it is for a very limited purpose only and you as jurors are to decide the facts which are to be true and only if you are convinced beyond a reasonable doubt of this fact, so bear that in mind when you are listening to the testimony of Miss Blanchard in this case, if there is any other testimony relating to this event which occurred in January of January *[sic]* of 1980.

"Mr. Goree is not [on] trial for that and you cannot

just from the mere fact that maybe he did this you
cannot use that as proof alone in this case, as I say, the
prosecutor will have to convince you beyond a reason-
able doubt of the identity of this thing so that the only
reason it is here is for the similarity. So you will get
further instructions on that at the end of the case, but I
want to let you know right now that it's coming in only
for a very limited purpose and you are to consider it
only for that purpose."

At the end of trial, the trial court instructed the
jury:

"You have heard evidence tending to show that the
defendant was guilty of an offense for which he is not
on trial. I am speaking of the testimony to the effect
that primarily about the testimony of Kathy Blanchard
to the effect that this defendant robbed and attacked
her.

"Now, you are the sole judges of whether to believe
any such evidence that you have heard here.

"However, should you believe such evidence, you are
cautioned that it is before you for a limited purpose,
that is, for the purpose of determining if it tends to
show:

"The identity of the person who committed the crime
with which the defendant is charged.

"This evidence must not be considered by you for any
other purpose. You must not, for instance, regard this
evidence as showing that the defendant is a person of
bad character or that he has a disposition to commit
crimes. You must not convict the defendant because
you believe he is guilty of other improper conduct."

Recognizing as we do the presumption against
the admissibility of similar-acts evidence to prove
identity and the danger of unfair prejudice to the
defendant arising from such use of similar-acts
evidence, we are persuaded that the trial court
here fully considered and evaluated the probative

value of the disputed evidence in light of the danger of unfair prejudice. We cannot say that he abused his discretion in deciding to admit the evidence in the circumstances of this case.

## Double Jeopardy

The people concede that a defendant may not be sentenced to two concurrent terms of life imprisonment for premeditated murder and felony murder for a single killing without violating the constitutional prohibition against double jeopardy. *People v Sparks,* 82 Mich App 44; 266 NW2d 661 (1978), *lv den* 411 Mich 1050 (1981); *People v Densmore,* 87 Mich App 434; 274 NW2d 811 (1978).

For the reasons set forth above, the defendant's conviction for premeditated murder is vacated and the defendant's conviction for felony murder is affirmed.

R. M. Maher, P.J., concurred.

M. J. Kelly, J. *(concurring in part and dissenting in part).* I respectfully dissent.

While I agree that there was substantial evidence showing that defendant was the perpetrator of the similar bad act and while I agree that the defendant's identity was a material issue of fact at trial, I am not persuaded that the charged offense and the similar act share a "high degree of similarity" or are "marked with special characteristics so uncommon, peculiar and distinctive as to lead compellingly to the conclusion that [both] were the handiwork of the defendant". *People v Golochowicz,* 413 Mich 298, 325; 319 NW2d 518 (1982). I find the similarities between the acts in this case no more compelling than the similarity between the

acts in *Golochowicz* and I would reverse on this issue.

I concur in the majority's refusal to find abuse of discretion in the trial court's admission of the blood-type evidence. While I continue to believe that blood-type evidence is generally inadmissible to show that a defendant is among 20% of the population sharing the victim's blood-type and admissible where defendant is among only 2% or 3% of the population, *People v Sturdivant,* 91 Mich App 128; 283 NW2d 669, *lv den* 407 Mich 933 (1979); *People v White,* 102 Mich App 156; 301 NW2d 837 (1980), I am also persuaded that 12% falls within that gray area best left to the discretion of the trial court. See, also, *People v Hayden,* 125 Mich App 650, 661; 337 NW2d 258 (1983).

I also concur in the majority's resolution of defendant's double jeopardy claim.