**Gary Wayne BEAM,
Petitioner–Appellee,
Cross–Appellant,**

v.

**Dale FOLTZ, Respondent–Appellant,
Cross–Appellee.**

Nos. 86–1596, 86–1642.

United States Court of Appeals,
Sixth Circuit.

Argued April 21, 1987.

Decided Nov. 10, 1987.

---

Kim Robert Fawcett, argued, Asst. Defender (State App.), Detroit, Mich., (Court-appointed), for Beam.

Rosemary A. Gordon, argued, Detroit, Mich., for Foltz.

Before MERRITT and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

This is a habeas corpus case in which the petitioner, whom a Michigan jury found guilty of a series of interrelated crimes, raises three issues: (1) prosecutorial misconduct during final argument, (2) ineffective assistance of counsel, and (3) double jeopardy. A federal district court granted habeas corpus relief as to the double jeopardy claim, but rejected the petitioner's other arguments. The petitioner has appealed, and the respondent (warden of the prison where the petitioner is incarcerated) has cross-appealed. We do not consider the double jeopardy claim meritorious, and the judgment in favor of the petitioner on that issue will be reversed. The judgment

denying relief on the other issues will be affirmed.

\* \* \*

The State of Michigan tried the petitioner, Gary Wayne Beam, on charges of first-degree criminal sexual conduct, armed robbery, and possession of a firearm at the time of commission of a felony. The complainant was a young woman who worked the midnight shift at a convenience store in a Detroit suburb. She testified that sometime after 2:00 a.m. on December 4, 1980, a man she subsequently identified as the petitioner came into the store, got a bottle of Pepsi Cola and brought it to the counter, put his hand inside his jacket, and pulled out a black handgun. The complainant testified that the man "put the gun to my waist, put his arm around my neck and said 'You're coming with me, Lady.'" With the gun pointed at her waist and the man's arm around her throat, the complainant was taken out of the store and into some nearby woods. There, as she tearfully told the jury,

"He told me I had to give him my love. He told me to take down my pants, I told him I couldn't. He put the gun to my belly, told me I had to.

Q. Then what happened?

A. He raped me."

Next, the complainant testified, the rapist told her to get dressed and asked her how much money was in the store's cash register. "I told him 20 or $30, and that he could have it if he didn't hurt me." They returned to the store and the complainant opened the cash register and turned over all the money that was in it. When asked why she did so, she testified "[b]ecause he had a gun held on me."

The complainant called the police after the man had left the store. She was able to give the police a description, and she assisted a detective in making a composite drawing of the man. The police had her look at several hundred photographs, and she picked out Mr. Beam's as depicting her assailant. Mr. Beam was put in a police lineup; the complainant identified him there, and subsequently identified him in court, as the man who had raped and robbed her at gunpoint. "There's no doubt in my mind," she testified, "that he was the man.

Mr. Beam's lawyer told the jury, in opening statement, that "we have no doubt whatsoever about the commission of these crimes;" the defenses were that Mr. Beam was a victim of misidentification and that he had an alibi, having been with his fiancee at the home of a Mr. and Mrs. Brown on the night the crimes were committed. Mr. Beam so testified, and although there were some discrepancies in the corroborating testimony, the Browns and the fiancee did offer testimony supporting the alibi. Fingerprints on an unopened Pepsi Cola bottle found at the scene of the rape did not match Mr. Beam's, moreover, and although the complainant testified that her assailant had no moustache, there was testimony that Mr. Beam did have a moustache.

The opening statement of petitioner Beam's lawyer anticipated prosecution evidence that the petitioner's blood type matched that of the rapist. Attempting to capitalize on the fact that the scientific tests performed by the state were not as comprehensive as they might have been, petitioner's counsel told the jury:

"You're also going to hear that the blood type matched. However, you're going to hear it was O Positive Blood, and it's better than half the population, you'll be told, that has O Positive Blood. And I'm asking you to pay close attention to this part of the testimony because there are very, very sophisticated tests available where they can show within 1% of the population, to exclude somebody as a Defendant.... [W]e're going to show that these tests were not made, that they were perfectly within the realm of feasibility to have been made, and that it was the prosecution's duty to have made these tests, and in fact use the latest scientific developments to arrive at the truth in this case."

The evidence presented by the prosecution did show that Mr. Beam's blood type matched the rapist's, and that certain tests that might have narrowed the field of sus-

pects were not performed. A witness from the state police crime laboratory, Charlotte Day, testified on direct examination that she had analyzed samples of the complainant's clothing and bodily fluids, as well as samples of blood, saliva and hair from petitioner Beam. Mrs. Day testified that in about four cases out of five, an individual's blood type can be determined from other bodily fluids; that such individuals are called "secretors;" that analysis of seminal fluid obtained from the complainant's clothing and vaginal swabs taken after the rape established that the rapist was a secretor with type O blood; that 32% of the male population are type O secretors; that petitioner Beam was a type O secretor, but the complainant was not; that serological testing is never conclusive, and "[b]y no means is that test, in any stretch of the imagination, conclusive evidence that the Defendant was the rapist;" that additional tests, which the police laboratory had the capability of performing, could have narrowed further the potential source of the seminal fluid found on the complainant's person and clothing; and that such tests were not performed in this case because "we have a very severe budget crunch in the State and we have very severe understaffing, [with the result that] only the minimal amount of work is possible to do in any given case."

On cross-examination Mrs. Day testified that she was aware of the existence of biochemical testing procedures and enzyme testing procedures that "could eliminate a great many potential suspects" and "frequently do." Mrs. Day testified that she was not familiar with the technique of running such tests, and that no such tests were run in this case.

After Mrs. Day and the jury had been excused, the prosecutor noted that he had requested a bench conference "just before I asked Mrs. Day about the comparison of the blood typing with the samples and the Defendant's blood ... at which time I asked Defense Attorney if she intended to go into this blood typing method. She indicated she did." The prosecutor explained that notwithstanding an appellate decision treating such testimony as more prejudicial than probative, "I began to go into it be-

cause Defense Attorney had already mentioned it in opening statement in front of the jury. So I felt that it was fair for me to ask some questions about it...." The prosecutor requested permission to put this statement on the record, and defense counsel responded thus:

"I don't mind. He stated the situation fairly. It is an essential part of my defense, the lack of additional testing and the fact that so many people do have O positive blood."

The prosecutor tried to deal with this defense in final argument, broaching the topic by saying "[l]et's dispose of the notion that we don't have a case if we haven't shown the Defendant's blood-type was the type that was found down to the last detail...." The prosecutor's argument continued as follows:

"[A] lot of times I think this can be confusing because it ... somehow sounds as if we're trying to prove that he's the rapist because his blood type matches, but that's not the case at all. That is not true.

"Why?

"Well, first you can never prove that somebody is the rapist by means of blood typing because it can't get that specific. It can't get that detailed. We can say, for instance, in this case, the Defendant has Type O blood and * * * [t]he Defendant is a secretor and Type O blood was found in the fluid; therefore he could have been the donor. He could have been. * * * But it doesn't come anywhere near to proving that he's the man. * * * Out of fairness rape victims are regularly taken to hospitals to be examined, seminal fluid, if found, is examined and is compared with the blood type of a Defendant to see if its possible to scientifically eliminate the Defendant. Therefore, any evidence of blood typing really would come in as part of the defense case more logically. But since it's done routinely, the prosecution routinely offers that witness as a witness for the defense to cross examine, and that was done in this case.

"And what came out of the cross-examination? We came nowhere near proving through that evidence that the Defendant is the rapist and he cannot be eliminated. * * * Other tests could have been run. Maybe one of them would have eliminated the Defendant. Well, I suppose you can argue, you now ought to find the Defendant not guilty because the prosecution did not do everything it could have done to try and prove the Defendant didn't do it. But you see, if you do that you're twisting it around a little badly. You're twisting it around until you're putting the whole burden of trying to prove not only the Defendant's guilty, but the Defendant is innocent, on the prosecution, and our system really isn't setup that way. The law does not obligate, the prosecution at least, to do everything conceivably possible to try and prove he's innocent. At least to some extent it's still an adversary proceeding and at least to some extent that duty and that job is left to the defense. I suppose you could simply say, if the defense thinks there's really scientific evidence that's going to prove the Defendant didn't do it, then defense give that evidence. Again it's still an adversary proceeding and I think you would be doing an injustice if you said to yourself, 'Well, I'm convinced that he did it, but I'm going to let him off because the prosecution didn't do everything they could to prove that he didn't do it.' You see, that's not really our obligation. Fairness, yes, but not everything conceivable to prove that he's guilty."

Defense counsel did not object to any of this argument, but responded as follows in her own closing argument:

"Now, we had no obligation to prove anything, not blood type, not anything else. And Ladies and Gentlemen, he said that this was properly part of the defense' case. My instructors in law school and his instructors in law school—

"[PROSECUTOR]: Objection.

*    *    *    *    *    *

"[DEFENSE COUNSEL]: Well, the Judge is going to instruct you that the burden of proof is on the prosecutor. There's no burden on me at all to go out and get blood testing or anything else. In fact, Ladies and Gentlemen, by the time a defense attorney comes into a case, any case of this type, it is—

"[PROSECUTOR]: Objection.

*    *    *    *    *    *

"[BY DEFENSE COUNSEL]: As I was stating previously, Ladies and Gentlemen, the practical saide (sic) of it is, by the time defense counsel is appointed and enters the case and then files appropriate motions with the court and arguments on it, quite a period of time has gone by. And as a practical matter, our being able to have tests made of the blood and of anything else from the lab, tests that are made within a few hours by the police and for our opportunity to double check on this with our own set of tests is a practical impossibility. And those of you who engaged in the Scientific Arts will know that."

*    *    *    *    *    *

"Now I asked you at the start of the trial to pay particular attention to the scientific portion of this trial. And I'm sure you listened to this evidence very carefully.... And they didn't meet ... their burden in terms of physical evidence first, in terms of the fingerprint evidence * * * [a]nd secondly, in the blood evidence. And I emphatically stated, in spite of what the prosecutor said, that the State had a responsibility ... to use the latest and the best tests available to exclude as many possible donors or suspects from suspicion."

Defense counsel went on to point out that mistaken identifications can and do occur, alluding to national publicity about cases where positive and unequivocal identifications of rapists have turned out to be mistaken. Defense counsel then told the jury she had read of local cases where misidentifications occurred even "where the person invited them to their apartment ... after a nice social evening in a bar and still pointed out the wrong person." The prosecutor objected, and in the course of the ensuing colloquy defense counsel held

up a newspaper article in front of the jury. The court sustained the objection, and defense counsel continued as follows:

"Generally, Ladies and Gentlemen, these mistakes in identification can occur. They do occur. It's a common human failing, particularly in stress situations; and for this reason I maintain the State has the absolute burden or duty to do everything it can to make sure they've got the right person before they put the case in front of you for a decision.

"Charlotte Day, while on the stand, the Scientist, testified that of course, in any case of this kind, the more testing that you do, the better. And she had no good excuse for not having run the more sophisticated test on it and eliminating more people with Type O Blood."

After defense counsel concluded her argument, the prosecutor closed with a rebuttal that included these words, among others:

"[N]o blood test ever can prove the Defendant did it or even come close. Well, all right. Then you say you have an obligation to run every conceivable blood test to prove he didn't do it. You can, if you want, place that obligation on the police, but the law doesn't place that obligation. * * * And you will be so instructed. * * * You will not hear that we have that obligation, which means we don't. If we did, the Judge will tell you. He's not going to tell you."

\*   \*   \*   \*   \*   \*

"... [Y]ou were told that it would be impossible for the defense to have tested the blood sample because all the Defendant had was the attorney and her assistant. And anyway, it would be much too late. All the scientific community agrees that that's impossible. * * * It is not true, that all the Defendant had was his attorney and her assistant, whereas I had the entire powers of the State of Michigan. So, too, did the Defendant through the Court. The Court can, upon request, and with some showing of need or necessity or justice or due process, order any number of things, and order

that it be paid for by the court, including blood samples."

The excerpts quoted above represent only a small part of arguments that fill a total of about 58 pages in a transcript that was prepared in unusually small type.

The Michigan trial court delivered a fair and comprehensive set of jury instructions. The defendant made no objection to the instructions, aside from an objection (not pressed subsequently) that the jury ought to have been told that an alibi defense is as good as any other defense. The court fully instructed the jury on the presumption of innocence, a presumption that is "[b]asic to our system of criminal justice," that "continues throughout the trial," and that must be "foremost in your mind." The jury was told, further, that

"[t]he law does not require a defendant to prove innocence or to produce any evidence whatsoever. This burden is upon the prosecution throughout the entire course of the trial, and at no time does the burden of proof shift to the defendant. This burden means that each element of the crimes charged must be proven beyond a reasonable doubt."

The court carefully explained the elements of the three crimes with which the petitioner was charged, and told the jury "[i]t's the theory of the Defendant that if any of these crimes were committed at such time and place, it was not the Defendant who committed them because at that time he was elsewhere in the company of Mr. & Mrs. Brown and others." The conflict in the evidence would have to be resolved, the court explained, by determining whether the prosecution "established one or more of the crimes charged beyond a reasonable doubt."

The jury found Mr. Beam guilty on each of the three counts with which he had been charged. The court sentenced him to imprisonment of not less than 7 or more than 30 years for first-degree criminal sexual conduct and not less than 5 years or more than 12 years for armed robbery, both terms to be served concurrently. A two-year sentence was imposed for possession of a firearm in the commission of a felony,

that sentence to be served, as required by law, prior to the commencement of the other terms.

Mr. Beam was advised of his right to appeal, and was told that the court would appoint a lawyer to handle the appeal if he did not have the money to hire a lawyer. An appeal was taken, and in a decision published under the style *People v. Beam,* 125 Mich.App. 289, 335 N.W.2d 684 (1983), the Michigan Court of Appeals affirmed the conviction. The Supreme Court of Michigan denied leave to appeal and denied reconsideration of that decision. 418 Mich. 858.

Mr. Beam then sought a writ of habeas corpus from the United States District Court for the Eastern District of Michigan. District Judge Guy (now a circuit judge on this court) declined to grant habeas relief on the petitioner's claims of prosecutorial misconduct and ineffective assistance of counsel, but Judge Guy deferred decision on a claim that the petitioner's simultaneous convictions for first-degree criminal sexual conduct and armed robbery constituted double jeopardy. Judge Guy ordered that counsel be appointed for petitioner on the latter issue. In a subsequent decision by District Judge Hackett the double jeopardy claim was held to be meritorious, and the court ordered that the petitioner be released within 60 days unless his armed robbery conviction was vacated or his criminal sexual conduct conviction was reduced from first-degree to third-degree.

The petitioner appealed to this court from Judge Guy's decision, and the respondent took a cross-appeal from Judge Hackett's decision.

\*   \*   \*

Petitioner Beam contends first that his trial was fundamentally unfair because the prosecutor improperly shifted the burden of proof by telling the jury that Mr. Beam had a duty to produce evidence of his innocence in the form of additional blood tests. The federal district court rejected this argument, relying on *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed. 2d 431 (1974), for the proposition that an isolated comment implying that the peti-

tioner had a duty to bring forth evidence of innocence did not amount to a denial of a fundamentally fair trial. Having considered the record as a whole, we believe the district court was correct.

*Angel v. Overberg,* 682 F.2d 605 (6th Cir.1982), an en banc decision in which this court reversed a judgment granting habeas corpus relief on account of prosecutorial misconduct in final argument, had this to say on the subject:

"The prosecutor is ordinarily entitled to wide latitude in rebuttal argument and may fairly respond to arguments made by defense counsel. *Donnelly v. De-Christoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Before habeas relief is granted, the prosecutor's statements must be so egregious as to render the trial fundamentally unfair. *Id.* This determination is to be made by evaluating the totality of the circumstances surrounding each individual case. *Hayton v. Egeler,* 555 F.2d 599, 604 (6th Cir.), *cert. denied,* 434 U.S. 973, 98 S.Ct. 527, 54 L.Ed.2d 463 (1977)." *Angel,* 682 F.2d at 607–08.

The argument under attack in the case before us was made in response to a defense argument that not only had been foreshadowed in the opening statement of Mr. Beam's counsel, but that counsel had said would be "an essential part of my defense;" namely, that the state ought to have performed more serological tests than it did. For the most part, the prosecutor's comments on this issue were unexceptionable. He emphasized—as his expert witness had done—that taken by themselves, the serological tests "came nowhere near" proving that Mr. Beam was the rapist. The prosecutor argued forcefully that the state had no legal obligation to run every conceivable blood test; the petitioner no longer contests that proposition. And the prosecutor argued, properly enough, that if the jury were convinced that Mr. Beam was the rapist, it ought not to let him off because of the prosecution's failure to do everything possible to prove his innocence.

■ We agree with the petitioner that the prosecutor's argument did have some

tendency to mislead insofar as it suggested that "at least to some extent that duty and that job [of trying to prove ... the Defendant is innocent] is left to the defense." " '[I]n the heat of argument, counsel do occasionally make remarks that are not justified,' " *United States v. Young*, 470 U.S. 1, 10, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985), quoting *Dunlop v. United States*, 165 U.S. 486, 498, 17 S.Ct. 375, 379, 4 L.Ed. 799 (1897), but in the context of Mr. Beam's trial as a whole, we do not believe either that the jury could have been under any misapprehension as to what the law actually requires or that the prosecutor's statement was so egregious as to render the trial fundamentally unfair. Defense counsel told the jury "we had no obligation to prove anything, not blood type, not anything else," and the court's instructions left no room for doubt that this was correct. The potential for prejudice was relatively slight, the objectionable portion of the prosecutor's argument was not extensive, the prosecutor does not seem to have tried deliberately to mislead the jury, and the eyewitness testimony against the accused was very strong. Even if this were a direct appeal, these factors would militate against our upsetting the verdict of the jury, *United States v. Leon*, 534 F.2d 667 (6th Cir.1976), and in a habeas corpus case they militate still more strongly in favor of letting the verdict stand.

Mr. Beam's own trial counsel, who could sense the atmosphere of the courtroom in a way we cannot, and who was in a better position than we to gauge the probable effect of the prosecutor's argument on the jury, chose not to object to the portion of the argument now complained about. Such a failure would be significant, again, on direct appeal, *United States v. Bess*, 593 F.2d 749, 757 (6th Cir.1979), and it is certainly no less significant here, where our sole function is to determine whether the trial was so unfair as to have been unconstitutional. Petitioner (now represented by other counsel) argues that "defense counsel was either ignorant of, or opposed to using, a contemporaneous objection," but the fact is that defense counsel did interpose objections elsewhere in the prosecutor's closing argument, and we cannot fault her judgment in deciding not to make an issue of the portion of the argument to which her successor takes exception now that the jury has spoken.

■ The prosecutor made several objections of his own during defense counsel's final argument, one of which objections was withdrawn outside the presence of the jury. The petitioner now contends that failure to tell the jury of the withdrawal somehow suggested that the defendant had the burden of producing evidence that there was no opportunity for the defendant to do additional serological testing. The trial judge carefully instructed the jury that the defendant was not required to produce any evidence, however, allowed defense counsel to argue that it would have been a practical impossibility for the defense to run any tests, and told the jury that objections by counsel and rulings by the court were not evidence and should not be considered as evidence.

Petitioner's brief offers a number of additional variations on the theme that what happened during final argument was constitutionally impermissible, but having examined each of these contentions in the light of the record as a whole, we do not find them persuasive. Petitioner's trial was not fundamentally unfair.

\* \* \*

■ Petitioner's ineffective assistance of counsel claim is based on two alleged errors of defense counsel. First, petitioner points to defense counsel's failure to object to the claimed shifting of the burden of proof in the prosecutor's closing argument. Second, he contends that defense counsel invited prejudicial rebuttal argument by showing the jury the newspaper article on misidentification and by telling the jury, without any supporting evidence, that defense counsel had no real opportunity to perform additional serological tests. Defense counsel may have been a little overzealous in some respects and a little overcautious in others, but if errors of judgment were made, we certainly cannot say that they were "so serious that counsel ·

was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The benchmark we must apply here is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. Counsel's representation of Mr. Beam did not fall "below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. at 2064, and even without the "highly deferential" scrutiny that counsel's performance must receive under *Strickland,* we could not say that defense counsel conducted herself unreasonably. *Cf. Strickland* at 689, 104 S.Ct. at 2065. On balance, defense counsel appears to have done a good job with a very difficult case; the fact that she failed to win an acquittal does not mean that her performance was constitutionally deficient.

\* \* \*

Our analysis of the final issue begins with the text of the Fifth Amendment to the United States Constitution. The amendment provides, in pertinent part, that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb...." This prohibition now extends to the states by reason of the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

The Supreme Court has interpreted the Double Jeopardy Clause as prohibiting not only a second prosecution after a conviction or an acquittal for the same offense, but also as prohibiting "multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969); *cf. United States v. Schuster,* 769 F.2d 337, 340 (6th Cir.1985), *cert. denied,* 475 U.S. 1021, 106 S.Ct. 1210, 89 L.Ed.2d 322 (1986). Determination of the maximum quantum of punishment that may be meted out for a particular offense or combination of offenses is a legislative question, and the constitutional prohibition against multiple punishments for the same offense simply means that no

court may impose more punishment than the legislature intended. Thus the Supreme Court has declared that "the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent." *Ohio v. Johnson,* 467 U.S. 493, 499, 104 S.Ct. 2536, 2541, 81 L.Ed.2d 425 (1984), citing *Missouri v. Hunter,* 459 U.S. 359, 366–68, 103 S.Ct. 673, 678–79, 74 L.Ed.2d 535 (1983).

As far as the case at bar is concerned, Mr. Beam was not subjected to a second prosecution for an offense of which he had already been either acquitted or convicted. He was prosecuted only once, and the question is whether that prosecution exposed him to more punishment, for the same offense, than the Michigan legislature intended.

The first count of the information on which Mr. Beam was tried charged a violation of § 750.520b(1), Michigan Compiled Laws Annotated. Section 750.520b, captioned "First degree criminal sexual conduct," provides in pertinent part as follows:

"(1) A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:

\* \* \* \* \* \*

(c) Sexual penetration occurs under circumstances involving the commission of any other felony.

\* \* \* \* \* \*

(e) The actor is armed with a weapon or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a weapon."

Subsection (2) of § 750.520b provides that "[c]riminal sexual conduct in the first degree is a felony punishable by imprisonment in the state prison for life or for any term of years."

The crime of third degree criminal sexual conduct, a felony punishable by imprisonment for not more than 15 years, is identical to the more serious crime in requiring "sexual penetration with another person." M.C.L.A. § 750.520d. The penetration need not occur under circumstances involv-

ing the commission of another felony, however, nor need the actor be armed with a weapon; it is sufficient, for the crime of third-degree sexual conduct, that "[f]orce or coercion is used to accomplish the sexual penetration." *Id.*

Mr. Beam was charged with the greater offense, and Count I of the information alleged both that the sexual penetration occurred under circumstances involving the commission of another felony (an allegation which, if proved, would warrant conviction under § 750.520b(1)(c)) and that the actor was armed with a weapon (an allegation which, if proved, would warrant a conviction under § 750.520b(1)(e)).

The "other felony" on which the charge of first-degree criminal sexual conduct was predicated in Mr. Beam's case was the felony defined in M.C.L.A. § 750.529, captioned "Armed robbery; aggravated assault." The first sentence of § 750.529 reads as follows:

> "Any person who shall assault another, and shall feloniously rob, steal and take from his person, or in his presence, any money or other property, which may be the subject of larceny, such robber being armed with a dangerous weapon, or any article used or fashioned in a manner to lead the person so assaulted to reasonably believe it to be a dangerous weapon, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years."

Count II of the information charged Mr. Beam with having violated this statute by feloniously taking U.S. currency from the person of the complainant, or in the complainant's presence, while armed with a dangerous weapon referred to in the information as a "B.S. Automatic."

Petitioner Beam offers the following argument in support of the conclusion that his conviction on Counts I and II of the information constituted a violation of the Double Jeopardy Clause:

*First,* he says, there is no way of knowing whether the extra-penetration circumstance that led to his conviction for first-degree criminal sexual conduct was "the commission of any other felony" (subsection (c) of the statute) or the actor's being "armed with a weapon...." (subsection (e) of the statute). Both circumstances were charged, either would support a conviction, and neither was specified in the jury's general verdict of "guilty" on Count I. Conceding that he would not have been subjected to double jeopardy if the jury found him guilty on the basis of subsection (e) (sexual penetration by one armed with a weapon or weapon-like article), Mr. Beam argues that he may in fact have been found guilty solely on the basis of subsection (c) (sexual penetration under circumstances involving the commission of another felony). The latter explanation of the jury's verdict being possible, he says, it must be presumed to be the correct one.

*Second,* petitioner Beam argues, convictions for violations of M.C.L.A. §§ 750.520b(1)(c) and § 750.529 would constitute convictions for the "same offense." And *third,* he says, by sentencing him to concurrent terms of 7 to 30 years on the offense charged in Count I and 5 to 12 years on the "same offense" in its Count II aspect, the court imposed multiple punishments not intended by the Michigan legislature.

We could not accept petitioner's argument without rejecting the conclusion reached by the Supreme Court of Michigan in *People v. Robideau,* 419 Mich. 458, 355 N.W.2d 592 (1984). In that decision, which contains a detailed and lucid analysis of the case law on double jeopardy, the Michigan Supreme Court concluded that the Michigan legislature "*unmistakably* ... intended that the crimes of first-degree criminal sexual conduct and ... robbery ... be separately punished." 355 N.W.2d at 605 (emphasis supplied).

The district court did accept petitioner's argument, concluding, among other things, that the Michigan legislature had not "clearly" intended that separate punishments be permitted, and that *Robideau* erred in deciding that the so called "*Blockburger* test" for determining when two crimes are "the same" is simply a test of statutory construction that "should be abandoned." *Robideau,* 355 N.W.2d at

603. (The *"Blockburger* test" takes its name from *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), where the Supreme Court said "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.")

■ Whether the *Blockburger* test ought to be abandoned as a matter of federal law is a question that only the United States Supreme Court can answer, of course. As the district court acknowledged, however, the Michigan court was undeniably correct in characterizing the test as a rule of statutory construction. *Albernaz v. United States,* 450 U.S. 333, 340, 101 S.Ct. 1137, 1143, 67 L.Ed.2d 275 (1981); *Missouri v. Hunter,* 459 U.S. 359, 367, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983). Even if it be true, as the district court believed, that states are required to follow this rule of construction as a matter of federal constitutional law (a proposition we find difficult to reconcile with *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)), and even if application of the rule compelled the conclusion that first-degree criminal sexual conduct and the underlying felony of armed robbery constitute the "same offense," it would not necessarily follow that the Michigan Supreme Court erred in holding that the Michigan legislature intended to authorize greater punishment for a person whose conduct came within both of the criminal statutes in question. Two separate and distinct questions are presented: whether the crimes for which the defendant was convicted were the same offense, and, if so, whether the legislature intended to allow more than one sentence to be imposed. *Pryor v. Rose,* 724 F.2d 525, 529 (6th Cir.1984). An affirmative answer to the first question does not automatically compel a negative answer to the second.

Interesting as these questions may be, the facts of the case before us do not require us to decide whether first-degree criminal sexual conduct and armed robbery constitute only a single offense, or whether the Michigan legislature intended to autho-rize multiple punishments for that offense or those offenses. The validity of the second and third branches of Petitioner Beam's argument need not be decided here because his argument fails in the first of the three propositions on which it rests.

■ The first branch of petitioner's argument requires us to accept the hypothesis that the jury might have believed that Mr. Beam was the assailant who raped the complainant in the woods and subsequently took the money from her cash register at gunpoint, but that he was not armed with a weapon at the time of the rape. The hypothesis is simply untenable; there is no reasonable possibility that this was the jury's understanding. It is entirely conceivable that the jury might have believed that the complainant misidentified Mr. Beam, just as it is entirely conceivable that the jury might have believed that Mr. Beam and his friends were telling the truth when they testified that he was somewhere else on the night in question. That is not what the jury found, however. There is no question that the crimes occurred ("we have no doubt whatsoever about the commission of these crimes," as Mr. Beam's own lawyer told the jury), and there is no question that the jury found it was Mr. Beam who committed them. Not a shadow of doubt was ever cast on the complainant's testimony that after entering the convenience store her assailant pulled a handgun from inside his jacket, put the gun to complainant's waist, and took her out of the store at gunpoint. We must take it as given, in view of the jury's verdict on the armed robbery charge, that the complainant was telling the truth when she testified that she returned to the store with her assailant after the rape and handed over the money because, as she testified, "he had a gun held on me." To accept all this as true, yet suppose that the jury was not persuaded the rapist had been armed at the time of the rape itself, would be, as the Michigan Court of Appeals said, "absurd." *People v. Beam,* 335 N.W.2d at 686, *supra.*

■ Notwithstanding the complainant's testimony that the rapist "put the *gun* to my belly" (emphasis supplied), the petition-

er's brief suggests the possibility that "[c]omplainant, once outside the store, mistook the Pepsi bottle for a gun...." But if we are to take seriously this suggestion that the complainant might have been raped at bottlepoint rather than at gunpoint, that does not advance the petitioner's cause at all. Under M.C.L.A. § 750.520b(1)(e) the actor would not have had to be armed with a weapon if he used "any" article—even an unopened bottle of Pepsi Cola—"in a manner to lead the victim to reasonably believe it to be a weapon."

The judgment of the district court entered on December 10, 1984, denying a writ of habeas corpus on the basis of prosecutorial misconduct and ineffective assistance or counsel, is AFFIRMED. The judgment entered on June 18, 1986, granting the petition for a writ of habeas corpus on double jeopardy grounds, is REVERSED.

MERRITT, Circuit Judge, concurring in part and dissenting in part.

Although I agree with the Court on the double jeopardy and ineffective assistance of counsel issues, I nonetheless believe that we should issue the writ, requiring a new trial. The prosecution's case is extremely weak. Petitioner should have a new trial because in such a case, the prosecutor's closing argument—uncured by the trial court—may well have confused the jury into thinking that petitioner bore a burden to prove his innocence.

Petitioner was convicted solely on the basis of the victim's weak identification. The only other evidence even arguably inculpatory was the fact that he (and 32 percent of all males) had the same seminal fluid type as the rapist-robber. This scientific evidence formed a substantial part of the prosecution's evidence.

As petitioner's lawyer attempted to argue to the jury, victim and eyewitness identification are unfortunately unreliable as sole evidence; they may produce—and

have produced—tragically erroneous results. *See, e.g., United States v. Wade,* 388 U.S. 218, 228 & n. 6, 87 S.Ct. 1926, 1933 & n. 6, 18 L.Ed.2d 1149 (1967) ("[T]he annals of criminal law are rife with instances of mistaken identification."). In such cases we must be vigilant to see that an innocent defendant is not sent to jail for a crime he did not commit. There is a substantial risk that that happened in this case.

Here the victim *never* described her assailant as mustachioed despite numerous opportunities to do so, including her participation in creation of a police drawing based on her description. The evidence was strong that before, at the time of, and after the date of the rape-robbery this petitioner had a mustache.

The victim *did* pick petitioner's photo from a mug book,[1] and later picked him from a lineup.[2] Curiously, although she noted from the first that her assailant had a distinctive voice, neither at the lineup nor at trial was the victim asked to comment on petitioner's voice.

Against this weak identification testimony, petitioner's case included (1) an alibi defense based on testimony from his fiancee and two friends whom the jury obviously did not believe; (2) the fact that a full Pepsi bottle, later found at the crime scene and described by the victim as being in her assailant's possession, bore fingerprints that *were not* petitioner's; and (3) a vigorous attempt to combat any inculpatory effect resulting from the 32–percent seminal fluid evidence.

It was in this context that the prosecutorial misstatements occurred.

The majority excuses these comments because, viewing the totality of the circumstances, it concludes that petitioner's trial was "not fundamentally unfair" in violation of due process, citing *Donnelly v. De-Christoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

---

1. Petitioner's photo was in the mug book due to a previous conviction for receiving stolen property.

2. Because the photo identification preceded the lineup, it seems to me that the two "identifica-

tions" cannot be viewed as independently inculpatory. For the hazards of photo identification, *see e.g.,* Estrich, *Rape,* 95 Yale L.J. 1087, 1088 (1986).

The inquiry must be whether the prosecutor's remarks, uncured by the trial court, impermissibly misstated petitioner's burden of production and shifted the burden of proof from the government to petitioner, thus abrogating the fundamental presumption of innocence to which he was entitled. *See Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *United States v. Smith,* 500 F.2d 293 (6th Cir.1974).

The usual analysis of prosecutorial misconduct in this Circuit is the four-factor approach alluded to by the majority:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir.1982) (quoting *United States v. Leon,* 534 F.2d 667, 679 (6th Cir.1976)).

As discussed *supra,* I believe that the weakness of the State's identification case here focused the jury's attention upon the seminal fluid evidence, that the prosecutor's remarks about petitioner's "burden" therefore took on added importance, and that this importance was magnified further when the prosecutor repeatedly objected to defense counsel's attempts to rebut the questioned remarks in her own closing argument. The trial court's failure to cure the prosecutor's remarks, or even to tell the jury that the prosecutor's objections to defense counsel's argument had been overruled, must have served further to increase the possibility of jury confusion.

The due process problem is accentuated by the way tests were run on the semen taken from the victim's vagina on the night of the rape. The prosecution performed the incriminating scientific tests on the seminal fluid to establish major blood type but then declined to perform further more specific blood-type tests that would have significantly narrowed the universe of possible rapists. The prosecution sought to cast on the defendant the burden of performing and placing in evidence these further more specific scientific tests even though the vaginal semen to be tested was in the possession and control of the state.

The majority acknowledges that "the prosecutor's argument did have some tendency to mislead" but deems it excusable because (1) the prosecutor was responding to a defense argument that the State could have performed additional tests upon the seminal fluid that might have exonerated petitioner, and (2) the trial judge "carefully instructed the jury that the defendant was not required to produce any evidence ... and told the jury that objections by counsel and rulings by the court were not evidence and should not be considered as evidence."

I do not agree that the prosecutor's remarks either were a response invited by defense counsel or were adequately cured by the trial court's general instructions to the jury on presumption of innocence and burden of proof. This is not a case that should implicate the "invited response" doctrine. *See Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). The "invited response" doctrine at best would take a "tit-for-tat" attitude toward prosecutorial remarks made in response to an improper defense argument. As the Supreme Court said in *United States v. Young,* however, *Lawn* and similar cases

> should not be read as suggesting judicial approval or encouragement of response-in-kind that inevitably exacerbate the tensions inherent in the adversary process. As *Lawn* itself indicates, the issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's "invited response," taken in context, unfairly prejudiced the defendant.
>
> In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but also take into account defense counsel's opening salvo.

470 U.S. 1, 12, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985).

Defense counsel's opening salvo here was not an improper argument. She merely sought to call the jury's attention to the fact that the state had within its sole power the opportunity to take evidence of questionable relevance [3] and test it further but, in the words of its own expert, had not done so because of cost consideration. It was in response to this criticism that the prosecutor first suggested that perhaps the defense should have undertaken the additional tests "as part of the defense case" instead of "putting the whole burden" on the state because "our system really isn't set up that way" and "that's not really our obligation." The record is unclear whether it was, technically possible for the tests to be performed by the time trial defense counsel came into the case. This is not a case in which a misstatement by the prosecutor, though regrettable, merely "right[ed] the scale" following an equal but opposite misstatement by defense counsel. *Cf. United States v. Young*, 470 U.S. at 13, 105 S.Ct. at 1045.

The majority says that the trial court's instructions "left no room for doubt" that petitioner "had no obligation to prove anything, not blood type, not anything else." I do not agree.

It is true that defense counsel chose not to interrupt the prosecutor's objectionable closing argument with a contemporaneous objection.[4] And it is true that the trial judge did give, at the conclusion of all proceedings immediately before the jury retired for deliberation, the following instructions:

Basic to our system of criminal justice is the first hope that a person accused of a crime is presumed to be innocent. This presumption of innocence starts at the very beginning of the case and continues throughout the trial. Each and everyone

[sic] of you must be satisfied beyond a reasonable doubt, after deliberating, that the Defendant is guilty before you can return a verdict of guilty. You must begin your deliberations with the presumption of innocense [sic] foremost in your mind. The fact that the Defendant was arrested and is on trial is not evidence against him. There must be evidence introduced that convinces you the Defendant is guilty beyond a reasonable doubt.

The law does not require a defendant to prove innocence or to produce any evidence whatsoever. This burden is upon the prosecution throughout the entire course of the trial, and at no time does the burden of proof shift to the defendant. This burden means that each element of the crimes charged must be proven beyond a reasonable doubt.

Trial Transcript IV–57.

These instructions, while unexceptionable, did not specifically address either the issue of the seminal fluid tests or the prosecutor's remarks concerning petitioner's "burden." Nor was a "strong curative instruction," *Caldwell v. Mississippi*, 472 U.S. 320, 339, 105 S.Ct. 2633, 2645, 86 L.Ed. 2d 231 (1985), given immediately after the offending remarks, as the Supreme Court recommended in *United States v. Young*, 470 U.S. at 13–14, 105 S.Ct. at 1045–46, or given somewhat later but with specific reference back to the misleading remarks, as the trial court did in *Donnelly v. DeCristoforo*, 416 U.S. at 640–41 & n. 9, 94 S.Ct. at 1870 & n. 9.

As the Court noted in *DeChristoforo:* [T]he trial court took special pains to correct any impression that the jury could consider the prosecutor's statements as evidence in the case. The prosecutor, as is customary, had previously

---

**3.** The Michigan courts of appeals themselves are divided on whether seminal fluid typing evidence is relevant enough to avoid exclusion under the state version of Fed.R.Evid. 403. *See, e.g., People v. Smith,* 149 Mich.App. 189, 385 N.W.2d 654, 657 (1986); *People v. Goree,* 132 Mich.App. 693, 349 N.W.2d 220, 224–25 (1984); *People v. Camon,* 110 Mich.App. 474, 313 N.W. 2d 322 (1981); *People v. Sturdivant,* 91 Mich. App. 128, 283 N.W.2d 669 (1979). The Michigan

Supreme Court has yet to address this difficult issue of relevancy.

**4.** Defense counsel *did* inform the trial judge, when the prosecutor objected to her counterargument on the burden of proof issue, that the prosecutor had "seriously misstated the law to the jury." Trial Transcript IV–18.

told the jury that his argument was not evidence, and the trial judge specifically re-emphasized that point. Then the judge directed the jury's attention to the remark particularly challenged here, declared it to be unsupported, and admonished the jury to ignore it. Although some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect, the comment in this case is hardly of such character.

416 U.S. at 644, 94 S.Ct. at 1872 (footnotes omitted).

When erroneous and highly prejudicial remarks are made to the jury, the trial court's action or inaction in curing the defect is, in my view, the critical contextual variable in determining whether the misstatement may result in deprivation of a fair trial. This is the factor that best explains why the Supreme Court found no fundamental unfairness in *Donnelly v. DeChristoforo, United States v. Young* and *Darden v. Wainwright,* but did in *Caldwell v. Mississippi. See Darden,* 477 U.S. 187, 106 S.Ct. 2464, 2472–73 & n. 15, 91 L.Ed.2d 144 (1986); *Caldwell,* 472 U.S. at 339, 105 S.Ct. at 2645.

Finally, as must be obvious, because of the relative paucity of proof against petitioner and the realistic likelihood of jury confusion, I cannot regard what happened in this case as harmless error. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). I believe there is too great a likelihood in this case that the defendant did not commit the crime.

For the reasons I have stated, the writ should issue conditioned upon the state affording petitioner a new trial.