915 F.2d 1573
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jimmie Lee BOYKINS, Leo Eugene Jackson, James Perry Craven,
Defendants-Appellants.
 Nos. 89-3580, 89-3641 and 89-3798.
 United States Court of Appeals, Sixth Circuit.
 Oct. 2, 1990.
 
 1
 Before KEITH and RYAN, Circuit Judges and CHURCHILL, Senior District Judge.*
 
 
 2
 CHURCHILL, Senior District Judge.
 
 
 3
 Defendants-Appellants have raised various issues in this appeal of their convictions and sentences. For the reasons that follow, we affirm.
 
 I. Background
 
 4
 Defendants-Appellants were indicted by a grand jury in the Southern District of Ohio along with 7 others in a 32 count superseding indictment naming a host of narcotics trafficking charges.
 
 
 5
 Defendant Boykins was charged with and was convicted by a jury of 3 counts including conspiracy to distribute heroin and cocaine, using a telephone to facilitate a conspiracy to distribute and possess drugs and possession of heroin with intent to distribute. He was sentenced to 84 months under the sentencing guidelines.
 
 
 6
 Defendant Jackson was indicted and convicted by a jury of 7 counts including conspiracy to distribute heroin and cocaine, possession of firearms by a career criminal, 4 counts of use of a telephone to facilitate a narcotics conspiracy and possession of heroin with intent to distribute. Jackson received a number of concurrent sentences the longest of which was 210 months.
 
 
 7
 Defendant Craven was indicted on 12 counts and pled guilty to conspiracy to distribute heroin and cocaine and possession of heroin with intent to distribute. Craven was sentenced to concurrent terms of 228 months.
 
 
 8
 Because the legal and factual issues raised by each of the Defendants are distinct and independent, the appeals will be addressed separately.
 
 II. Jimmie Lee Boykins
 
 9
 Boykins cites 3 defects that he asserts require reversal and remand for a new trial.
 
 A. Search Warrant Affidavit
 
 10
 First, Boykins asserts that he was unable to obtain an officially authenticated copy of the affidavit supporting a search warrant served at his residence. He argues that it was a denial of due process to require counsel to work with a document that did not have a stamp or seal indicating that it had been filed with the clerk's office.
 
 
 11
 A deputy court clerk testified that it would be irregular to provide a certified copy of a document which was not stamped or sealed indicating that it had been filed with the clerk of court.
 
 
 12
 The District Court found that the search warrants were filed in a manilla envelope which was stamped by the clerk's office. The Court also found that 14 copies of the affidavit were delivered to the clerk's office by a special agent. Apparently, the District Court made this finding based upon the testimony of the special agent. The District Court also found the warrant and affidavit to be in proper form.
 
 
 13
 Rule 52(a) states that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 52(a). In U.S. v. Campbell, the Sixth Circuit held that the admission of unsigned depositions constituted harmless error because the defendant did not cite any specific errors in the deposition testimony, nor did he demonstrate any prejudice which might have resulted from the failure of the deponents to review and sign the transcripts of their testimony. 845 F.2d 1374, 1379 (6th Cir.1988), cert. denied, 102 L.Ed.2d 248 (1988). Here, Boykins has not shown that the copy he received, and upon which his motion to suppress was based, was not a correct copy of the original. Boykins does not allege on appeal that there was a substantive insufficiency in the affidavit.[1] Furthermore, Boykins has not demonstrated any prejudice as a result of not having a certified copy of the affidavit. Thus, Boykins' first argument must be rejected, because even if the affidavit was not properly filed, the failure to do so was harmless error.
 
 
 14
 B. Alleged Agreement Not to Prosecute Witness
 
 
 15
 Boykins contends that the government misled the participants in the trial by failing to disclose an alleged agreement not to prosecute Alvin Pettijohn, a government witness and informant, potentially affecting the jury's determination as to the credibility of his testimony. Pettijohn was originally arrested in an unrelated incident and charged by complaint, along with a co-defendant, with distributing cocaine. There is no evidence in the record that Pettijohn was ever indicted or prosecuted, while his co-defendant apparently went to trial. Special agent McCabe testified that he and special agent Morrow asked Pettijohn to become an informant. Special agent McCabe testified further that Pettijohn was promised that the government would bring his cooperation to the attention of probation and the judge in connection with his sentencing on the cocaine charge.
 
 
 16
 Defense lawyers noted on the record that no action was being taken to follow through with a prosecution of Pettijohn. The Assistant United States Attorney represented to the trial court that an indictment would be filed and that the only agreement was that Pettijohn would plead guilty and "that all the Government needs to do is to tell the Court that he offered his full cooperation."[2] Trial Transcript, Nov. 29, 1988, at 743.
 
 
 17
 Pettijohn was later recalled to the stand and he testified that he had no agreement with the government to testify in exchange for favorable treatment. He testified further that he taped a conversation with Mr. White, one of the defendants named in the indictment in this case, on his own initiative. Pettijohn was subsequently wired for sound and provided further assistance to the prosecution. He testified, however, that he was not expressly promised anything in return, nor did he get any winks or nods. The defense had ample opportunity to cross-examine Pettijohn and question his credibility before the jury.
 
 
 18
 Boykins bases his argument for reversal on the holdings in Giglio v. United States, 405 U.S. 150 (1972), and Brady v. Maryland, 373 U.S. 83 (1963). In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment." 373 U.S. at 87. In Giglio, the Supreme Court, following Brady, held that the failure by the government to disclose a promise of immunity, made to a witness upon whom the government's case depended, required reversal for a new trial. 405 U.S. at 108-9. In United States v. Bagley, the Supreme Court made it clear that a failure to disclose exculpatory or impeachment evidence must be so material as to deny the defendant a fair trial. 473 U.S. 667, 675-6 (1985). In Bagley, the Court established the standard for materiality as follows:
 
 
 19
 The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.
 
 
 20
 Id. at 682. The Bagley Court remanded the case to the Court of Appeals to determine whether there was a reasonable probability that, had the inducement offered to the government witnesses been disclosed, the result of the trial would have been different. Id. at 684.
 
 
 21
 Hence, in order to successfully challenge his conviction under the Brady doctrine, Boykins must establish (1) that Pettijohn perjured himself, and the AUSA misled the trial court, with respect to the absence of an agreement not to prosecute Pettijohn and (2) there is a reasonable probability that the outcome of the trial would have been different if the alleged agreement had been disclosed to the jury.
 
 
 22
 The record clearly shows, and the government admits, that in order to induce Pettijohn to act as an informant, the government agreed to inform the sentencing judge of his cooperation. The jury was repeatedly made aware of this agreement. There is circumstantial evidence that suggests that there was an implied, if not express, agreement not to prosecute Pettijohn. The government let the case lapse while prosecuting Pettijohn's accomplice and there is no evidence that Pettijohn was ever prosecuted.[3]
 
 
 23
 With respect to the second Brady requirement, Boykins has failed to show a reasonable probability that the outcome of the trial would have been different if the jury had been informed that Pettijohn was cooperating in exchange for not being prosecuted instead of an expectation of a reduced sentence. Defense attorneys repeatedly raised the issue of an alleged agreement before the jury and the jury had the opportunity to judge Pettijohn's credibility in that regard. In any event, it appears from the record that it was the tapes obtained using Pettijohn's cooperation that were most damaging to the defendants, not Pettijohn's testimony. Accordingly, we must reject Boykins' second argument because even if there was an agreement which was not disclosed, the failure to disclose it was not "material" for purposes of the Due Process Clause.
 
 C. Compulsory Process
 
 24
 An individual named Charlie Montgomery arrived at an address of one of the defendants (Craven) on June 2, 1988, the date of the narcotics transaction alleged in Count 30 of the indictment. The police fingerprinted him and took down his address, but he was not charged nor produced at trial. According to Boykins, Montgomery was Boykins' employer with respect to some remodeling work that was being performed at the address in question. The government declined or was unable to provide Boykins with Montgomery's address when requested and the Court declined to order its production. Boykins contends that Montgomery could have testified that Boykins was at that address to perform construction work, suggesting by implication that he was not there to participate in a narcotics transaction.
 
 
 25
 Boykins argues that the refusal by the government to provide Montgomery's address contravened Boykins' Sixth Amendment right to compulsory process. The Compulsory Process Clause provides that "the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. In Pennsylvania v. Richie, the Supreme Court stated that while the contours of the Compulsory Process Clause have not been thoroughly defined, "[o]ur cases establish, at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before the jury evidence that might influence the determination of guilt." 480 U.S. 39, 56 (1987). The Supreme Court has stated that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.... Indeed, this right is an essential attribute of the adversary system itself." Taylor v. Illinois, 484 U.S. 400, 408 (1988) (citations omitted).
 
 
 26
 In United States v. Valenzuela-Bernal, the Supreme Court held that the defendant, charged with transporting illegal aliens, did not establish a violation of his constitutional right to compulsory process where the government deported illegal aliens who might have testified at his trial. 458 U.S. 858, 867 (1982). The Court stated that the defendant "must make some plausible showing of how their testimony would have been both material and favorable to his defense." Id. Here, Boykins alleges that Montgomery could have testified that Boykins was at Craven's residence in order to conduct repairs. In Valenzuela-Bernal, the Supreme Court noted that the absence of any opportunity to interview the potential witnesses "may well support a relaxation of the specificity required in showing materiality." Id. at 870. The Supreme Court went on to say that
 
 
 27
 Roviaro supports the conclusion that while a defendant who has not had an opportunity to interview a witness may face a difficult task in making a showing of materiality, the task is not an impossible one. In such circumstances it is of course not possible to make any avowal of how a witness may testify. But the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality.
 
 
 28
 Id. at 871 (referring to United States v. Roviaro, 353 U.S. 53 (1957).
 
 
 29
 Thus, the defendant's burden in such a case is essentially the same as the Brady analysis discussed above. A criminal defendant has a substantive right to present a defense, but in order to establish a constitutional violation he must show that he was prejudiced by the government's actions. To do so he must establish that he was denied the opportunity to present relevant and material, i.e., potentially outcome determinative, information to the jury, such that the fairness of his trial is called into question.
 
 
 30
 Here, the government merely failed to give Boykins an address for Montgomery. If Boykins was working for Montgomery as he alleges, perhaps he could have located Montgomery on his own. Even if Montgomery could have testified as to alternative reasons for Boykins' presence at Craven's residence, there is sufficient evidence in the record to support the jury's determination. Boykins has not demonstrated any probability that the result would have been different if Montgomery had testified as asserted by Boykins. Accordingly, Boykins' final argument must be rejected and his conviction affirmed.
 
 III. James Perry Craven
 
 31
 Appellant Craven appeals the finding by the District Court that Craven be sentenced based upon a criminal history category of II under the sentencing guidelines. Craven argues that it was erroneous for the judge to consider Craven's prior conviction because that conviction was obtained through the use of illegal wiretaps.
 
 
 32
 Craven states in his brief that Cincinnati Police Officers have publicly admitted facts making it clear that Craven's phones were illegally tapped. There is no evidence in the record that this occurred. Comment 6 to Sec. 4A1.2 of the sentencing guidelines states that "[c]onvictions which the defendant shows to have been constitutionally invalid may not be counted in the criminal history score.... Nonetheless, any conviction that is not counted in the criminal history score may be considered pursuant to Sec. 4A1.3 if it provides reliable evidence of past criminal activity."
 
 
 33
 The District Court, in the judgment and sentence of Craven, reasoned that
 
 
 34
 [t]his Court must give full faith and credit to the judgment of another United States Court until that judgment is set aside. The Court notes that it viewed the tape submitted in support of this objection. Based upon that tape, the Court determines that in 1972, the defendant was involved in drug trafficking and gun running.
 
 
 35
 Without adopting the reasoning of the District Court[4], we find nothing in the record to suggest the possibility of a successful attack on the prior conviction.[5] Hence, Craven's argument must be rejected and his sentence affirmed.
 
 IV. Leo Eugene Jackson
 
 36
 A. Disclosure of Prosecution's Evidence Before Trial.
 
 
 37
 Jackson's first argument is that the procedure applied by the trial court under the Jencks Act, codified at 18 U.S.C. Sec. 3500, which allows the government to withhold evidence relating to a particular witness until after that witness has testified, denied the defense a reasonable opportunity to review it and prepare for cross-examination.
 
 
 38
 Jackson's position is essentially that the procedure followed by the trial court allowed "trial by ambush" and effected a denial of due process. Allowing the government to control the timing and amount of disclosure during trial hampers and delays cross-examination by defense counsel. He argues that the trial court should have granted the defense's pretrial motion for discovery of Jencks Act material so that defense attorneys could decide what was important for purposes of cross-examination.
 
 
 39
 The Sixth Circuit has expressly held that the government has no obligation to disclose and the trial court has no discretion to require disclosure of Jencks Act material before a witness testifies. United States v. Algie, 667 F.2d 569, 571 (6th Cir.1982). However, when the government exercises it right to withhold Jencks Act material, the defendant upon request is entitled to a reasonable adjournment to examine the material and to prepare for cross-examination. Here, defendant acknowledges that he did not make such a request. Accordingly, we must reject this argument.
 
 
 40
 B. Government's Conditional Plea Offer.
 
 
 41
 The government made an offer of a plea agreement during jury selection which was conditioned on all defendants accepting guilty pleas. Jackson claims this was unfair. He cites no caselaw, nor does he specify what legal right was violated. During the course of the trial, the government entered into plea agreements with some of the individual defendants.
 
 
 42
 The Supreme Court has stated that there is no constitutional right to plea bargain. Weatherford v. Bursey, 429 U.S. 545, 561 (1977). As the Supreme Court stated in Mabry v. Johnson, "[a] plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest." 467 U.S. 504, 507 (1984). We are unaware of a legal basis for an allegation of constitutional error as a result of the government's conditional plea offer.
 
 
 43
 C. Refusal to Accept Guilty Plea.
 
 
 44
 Jackson attempted to enter a guilty plea with respect to counts 1 and 31 of the indictment. At the Rule 11 hearing, the government and the trial judge were not satisfied that there was an adequate factual basis for the plea. See Fed.R.Crim.P. 11(f). In response to a question from the District Court Jackson stated:
 
 
 45
 It says I conspired to distribute heroin and cocaine and possession. That's not true. I did not conspire to distribute heroin or cocaine with anyone.
 
 
 46
 The government then withdrew the plea agreement and the trial judge stated that he could not accept the plea.
 
 
 47
 Jackson argues that this action by the District Court was erroneous. In fact, acceptance of the plea after the above exchange, would likely have been reversible error. See United States v. Savage, 891 F.2d 145, 149 (7th Cir.1989) ("If [Defendant] was not in fact a member of the conspiracy described in the indictment, then there was no factual basis for the plea, and would have been error for the judgment to have been entered on the plea."). Accordingly, it was not error for the District Court to reject the plea agreement.
 
 
 48
 D. Defense Counsel Required to Make Opening Statement Prior to Presentation of Evidence by the Government.
 
 
 49
 Jackson contends that it was error for the District Court to deny the request of defense counsel to reserve their opening statements until after presentation of evidence by the prosecution. A review of the transcript of the trial reveals that the trial judge denied requests by four of the seven defense attorneys involved in the trial to reserve their opening statements until after the presentation of the government's proof. It is unclear from the record why the trial judge forced defense counsel to either make their opening statements prior to the presentation of the government's proofs or waive their opportunity to make one.[6] Jackson's attorney, however, made his opening statement without objection. Not only did Jackson's attorney not object, nothing in the trial record suggests that he did not wish to give his opening statement at that time. While, it appears that it would have been futile for Jackson's counsel to request to reserve his opening statement, by failing to do so he did not preserve the issue for appeal. Accordingly, this argument must be rejected.
 
 
 50
 E. Pretrial Disclosure of Statements of Co-conspirators that the Government Intended to Offer as Evidence.
 
 
 51
 Jackson argues that the government should have been required to disclose before trial statements of co-conspirators which the government intended to admit pursuant to Fed.R.Evid. 801(d)(2)(E). Jackson argues that statements by co-conspirators which concern statements made by Jackson are discoverable pursuant to Fed.R.Crim.P. 16(a)(1)(A) which reads in relevant part as follows:
 
 
 52
 Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, to the attorney for the government; the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent; and recorded testimony of the defendant before a grand jury which relates to the offense charged.
 
 
 53
 The District Court correctly noted in its order denying Jackson's motion that "Rule 16 does not require disclosure of statements of the defendant made to a third party witness or to undercover agents not then known as such to the defendant, and courts have generally denied such requests." See United States v. Green, 548 F.2d 1261, 1267 (6th Cir.1977); United States v. Zarattini, 552 F.2d 753, 757 (7th Cir.), cert. denied 431 U.S. 942 (1977). The co-conspirator statements do not fall within the ambit of Rule 16(a)(1)(A). Thus, this argument must also be rejected.
 
 
 54
 Jackson requested a pretrial hearing to determine admissability prior to the offering of the co-conspirator statements to insure compliance with United States v. Enright, 579 F.2d 980 (6th Cir.1978). In United States v. Vinson, the Sixth Circuit noted that such a hearing is an acceptable alternative method of dealing with co-conspirator statements, but it "has been criticized as burdensome, time-consuming and uneconomic" and whether to hold such a hearing is within the discretion of the trial judge. 606 F.2d 149, 152 (6th Cir.1979), cert. denied, 445 U.S. 904 (1980). The Vinson Court went on to note that the trial judge may "admit the hearsay (a) after the government has established the conspiracy by a preponderance of the evidence at the trial, or (b) at a 'mini hearing,' or (c) conditionally subject to connection." Id. at 153. The District Court stated that it would "follow the established practice pursuant to Vinson of conditionally admitting co-conspirators' statements at trial, subject to a ruling that the evidence is sufficient to establish the existence of a conspiracy by a preponderance of the evidence sanctioned by Enright." (citing United States v. Holloway, 740 F.2d 1373, 1375-6 n. 2 (6th Cir.1984), cert. denied, 469 U.S. 1021 (1984)). Accordingly, it was not error for the District Court to deny the request for a pretrial hearing.
 
 
 55
 F. Admissability of Coconspirator Statements.
 
 
 56
 Jackson contends that the District Court erroneously admitted statements of alleged co-conspirators before the government had shown that Jackson was involved in the conspiracy as required by Vinson and Enright. Rule 801(d)(2)(E) provides that "[a] statement is not hearsay if" it "is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In order to take advantage of this provision, the government "must show by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the course and in furtherance of the conspiracy." Vinson, 606 F.2d at 152.
 
 
 57
 Jackson also argues that there was inadequate evidence of involvement by him in the conspiracy to support the admissability of co-conspirators' statements. The District Court, after hearing argument concerning the admissability of coconspirator statements pursuant to Vinson, stated that
 
 
 58
 the Court will find that a conspiracy existed, that these three defendants were involved in that conspiracy, and that there were overt acts done to further that conspiracy after the conspiracy was formed to effectuate the object of the conspiracy, and that all three of these defendants were involved and I do say beyond a reasonable doubt. Any other finding you want me to make?
 
 
 59
 While the District Court, in making its finding, did not use the precise language of Vinson, it is sufficient to satisfy Rule 801(d)(2)(E) and we find no basis in the record for overturning the finding. For these reasons, this argument must also fail.
 
 
 60
 G. Sufficiency of Evidence to Support Conviction.
 
 
 61
 Jackson argues that the District Court erred in failing to grant his motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29(a). A court of appeals may not reverse a jury's verdict if there is substantial evidence to support it. United States v. Chandler, 752 F.2d 1148, 1151 (6th Cir.1985) (citations omitted). Furthermore, "[t]he Court must construe the evidence in the manner most favorable to the Government." Id. (citing United States v. Glasser, 315 U.S. 60, 80 (1941). After so doing, the court must then ask whether "any trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).
 
 
 62
 1. Possession of Firearm.
 
 
 63
 Jackson first contends that there was insufficient evidence to support the jury's conclusion that he possessed the firearms in question. The salesperson who sold the firearms testified that two persons came to the store to purchase them, Jackson and Helen Shipley. The salesperson also testified that Jackson insisted that they needed the firearm right away. A transcript of a tape of a telephone call made by Jackson to the store contains Jackson's statement that "I just spent four thousand dollars the last two weeks on weapons, okay." There was testimony that Shipley actually paid for the guns. Jackson contends that he was present at the store merely to advise Shipley.
 
 
 64
 The government argues that this is enough evidence to support at least constructive possession. "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." U.S. v. Craven, 478 F.2d 1329, 1333 (6th Cir.1973), cert. denied, 414 U.S. 866 (1973); United States v. Reeves, 794 F.2d 1101, 1105 (6th Cir.1986).
 
 
 65
 Based upon the evidence produced at trial a rational trier of fact could have found that Jackson had constructive possession in the sense that he had the power and intention to exercise some control directly or indirectly over the firearms.
 
 2. Distribution of Heroin
 
 66
 Jackson argues that there was insufficient evidence to convict him of distribution of heroin. David Walther testified that he purchased heroin from Jackson. Jackson contends that there was insufficient evidence that the substance he sold to David Walther was heroin. Apparently, Walther based his conclusion that the substance he purchased was heroin upon knowledge gained from prior experience buying and using heroin. Jackson asserts that the testimony of David Walther as to the effects of the substance he received from Jackson is insufficient to support the conclusion that the substance was heroin. Scientific identification is not an absolute prerequisite to conviction for a drug-related offense. United States v. Schrock, 855 F.2d 327, 334 (6th Cir.1988). Testimony by a purchaser of a drug can be probative as to the nature of the drug. Id.
 
 
 67
 A small quantity of heroin was also found at a residence which was allegedly Jackson's. Jackson contends that since the search was conducted four days after Jackson's arrest and since a third person had access to that residence, possession could not be attributed to him. An undated note from the person in whose name the phone was listed was found in the residence. The note read: "I came by after I heard and got what I could keep for you. Call me. [signed] Kim."
 
 
 68
 Jackson also argues that the alleged discovery of heroin among his effects after he was arrested is contradicted by the fact that it was not discovered when he was searched incident to the arrest. A marshall apparently testified that he found a small packet containing a residue of less than 1/100 of a gram of cocaine among Jackson's property. If it was cocaine, it is not relevant to the charge of distribution of heroin alleged in count 31 of the indictment.
 
 
 69
 The evidence is not overwhelming, but the jury could reasonably have found the testimony of David Walther credible, and could have inferred that the heroin at Jackson's residence was his. Therefore, this argument must also be rejected.
 
 
 70
 H. Statements by AUSA During Final Argument.
 
 
 71
 During rebuttal after Jackson's attorney's final arguments, AUSA Hunt made the statement that "I want to tell you that, in my experience, some 12 years as a Prosecutor, I have not yet heard a defense attorney stand up here at the close of proof and tell you that, 'well, I guess the government proved that my client is guilty,' and go sit down."[7] Hunt made a similar statement later in his argument. Jackson contends that this comment was improper because it refers to matters outside of evidence and suggests that Jackson is guilty by virtue of being on trial.
 
 
 72
 Certainly, the personal opinions of counsel have no place at trial. See United States v. Bess, 593 F.2d 749, 754 (6th Cir.1979). Jackson must show, however, that the statement was prejudicial, that it was so egregious as to make the trial fundamentally unfair. See Beam v. Foltz, 832 F.2d 1401, 1408 (6th Cir.1987), cert. denied, 485 U.S. 980 (1988). The statement made by Hunt arguably was improper, but is not so egregious that it constitutes grounds for overturning the jury's verdict. Accordingly, we affirm Jackson's conviction.
 
 
 73
 I. Acceptance of Responsibility.
 
 
 74
 As discussed above, Jackson attempted to plead guilty but his plea was rejected on the grounds of inadequate factual basis. Jackson contends that the only way he could get the two-level adjustment in offense level for acceptance of responsibility would have been to waive his Sixth Amendment right to a jury trial or waive his Fifth Amendment right not to incriminate himself. Jackson contends that the operational effect of the adjustment is to chill the exercise of these constitutional rights. This argument ignores the fact that a defendant can go to trial, not testify and still get an adjustment for acceptance of responsibility. Section 3E1.1 of the Sentencing Guidelines provides that a defendant may be given an adjustment for acceptance of responsibility "without regard to whether his conviction is based upon a guilty plea or a finding of guilt by the court or jury." We do not suggest that such an adjustment would be appropriate based upon the facts in this case.
 
 
 75
 He also contends that he was penalized for exercising his rights because he did not receive the favorable adjustment. Both the Eleventh and Fifth Circuits have rejected this argument. United States v. Henry, 883 F.2d 1010, 1012 (11th Cir.1989); United States v. White, 869 F.2d 822, 826 (5th Cir.1989), cert. denied, 104 L.Ed.2d 1033 (1989). In White, the Fifth Circuit noted that "[e]ven assuming that the sole purpose of this [acceptance of responsibility] guideline is to encourage guilty pleas, it is not unconstitutional for the government to bargain for a guilty plea in exchange for a reduced sentence." 869 F.2d at 826 (citing Brady v. United States, 397 U.S. 742, 753 (1970). The Eleventh Circuit stated
 
 
 76
 Section 3E1.1 may well affect how criminal defendants choose to exercise their constitutional rights. But 'not every burden on the exercise of a constitutional right and not every encouragement to waive such a right is invalid.' [citation omitted]. Persons involved in the criminal law process are faced with a variety of choices. Some of the alternatives may lead to unpleasant consequences. For example, to go to trial may result in greater punishment. To take the stand as a witness in ones's case opens the door to possible perjury charges a well as possibly strengthening the prosecution's case. Section 3E1.1 may add to the dilemmas facing criminal defendants, but no good reason exists to believe that 3E1.1 was intended to punish anyone for exercising rights. We are unprepared to equate the possibility of leniency with impermissible punishment. [citations omitted].
 
 
 77
 Henry, 883 F.2d at 1012.
 
 
 78
 We find this reasoning persuasive. Accordingly, we reject this argument.
 
 
 79
 With respect to Jackson's other arguments regarding his sentence, we find no clear error with respect to the factual determinations made by the sentencing judge, nor was it error for the judge to sentence Jackson at the high end of the applicable guideline range. Accordingly, we affirm the sentencing determination made by the District Court.
 
 
 
 *
 Honorable James P. Churchill, Senior District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Boykins contended before the District Court in his motion to suppress that the affidavit was defective because it did not indicate that any oath was administered nor did it bear a certification as to where and when it was subscribed and sworn to or before what officer
 
 
 [2]
 The trial court later stated that "if there is any evidence that comes out during this trial, or forever afterwards, where the Government has misrepresented that agreement, then the Government will pay dearly." Id. at 746
 
 
 [3]
 The government suggested at oral argument before this Court that Pettijohn eventually pled guilty to a cocaine charge. There is no evidence in the record, however, to support that statement. In any event, Pettijohn may have cooperated and testified based on an oral agreement which was subsequently rescinded by the government. In that case, the existence of a subsequent guilty plea would not lessen any doubts as to his credibility
 
 
 [4]
 The issue does not turn upon principles of full faith and credit. A sentencing judge may make a determination with respect to the constitutional validity of a prior conviction for purposes of sentence enhancement. See Comment, Sentence Enhancement Based on Unconstitutional Prior Convictions, 64 N.Y.U.L.Rev. 1373, 1382 (1989)
 
 
 [5]
 The District Court did not use the prior conviction per se as a basis for increasing Craven's criminal history category. The District Court made a fact finding that the evidence submitted concerning the events surrounding the prior conviction was reliable evidence of prior criminal activity. A reviewing court must accept the findings of fact made by the district court unless they are clearly erroneous. 18 U.S.C. Sec. 3742(e). Craven has not established that the District Court's finding was clearly erroneous
 
 
 [6]
 In United States v. Zielie, the Eleventh Circuit held that the timing and making of opening statements is within the discretion of the trial judge. 734 F.2d 1447, 1455 (11th Cir.1984), cert. denied, 469 U.S. 1189 (1985). The Eleventh Circuit also found that while the "failure to afford a defendant the opportunity to make an opening statement can constitute error, United States v. Breedlove, 576 F.2d 57, 60 (5th Cir.1978), an opening statement by a defendant is not a constitutionally guaranteed right." Id. The latter statement was made in reliance upon a misquoted portion of a footnote in Herring v. New York, 422 U.S. 853, 863 n. 13 (1974)
 In Herring, the Supreme Court invalidated, on Sixth Amendment assistance of counsel grounds, a New York statute which empowered a trial judge to deny counsel the opportunity to make a closing summation. 422 U.S. at 865. Footnote 13, relied upon by the Zielie Court, reads in its entirety as follows:
 We deal in this case only with final argument or summation at the conclusion of the evidence in a criminal trial. Nothing said in this opinion is to be understood as implying the existence of a constitutional right to oral argument at any other stage of the trial or appellate process.
 Id. at 863. The effect of this footnote was not to hold that there is no constitutional right to make an opening statement. The footnote merely limited the holding in Herring to the issue before the Supreme Court, i.e., the constitutional right of the accused to make a closing argument.
 Furthermore, the Zielie case is distinguishable from this case because in Zielie, defense counsel was allowed to reserve his opening statement, but once the prosecution had rested, defense counsel indicated that he would call no witnesses and introduce no evidence. The trial judge precluded counsel from making an opening statement at that time because it would have served no purpose. The purpose of an opening statement is to outline what counsel expects the evidence will show and to make it easier for the jury to relate each piece of evidence to the whole. See United States v. Dinitz, 424 U.S. 600, 612 (1976). To have allowed an opening statement when he did not intend to present proofs would not have served this purpose and would have effectively given defense counsel two closing arguments. Here, however, the trial court did not even allow defense counsel the opportunity to reserve their opening statements.
 As noted by the trial judge in his preliminary instructions, "the purpose of [an opening statement] is to assist us to understand the reason why a witness may be called and to understand what to expect or what to look for in that witness's testimony.... they are designed ... to give the lawyers an opportunity to lay out to you what they expect, what they think the evidence is." Forcing defense counsel to either make or waive his opening statement prior to presentation of proofs by the government severely limits the effectiveness of any such statement. Prior to presentation of the government's proofs, defense counsel may very well not know what evidence, if any, he will need to present to overcome or rebut the government's evidence. This problem is compounded by the withholding of Jencks Act material by the government. While the trial court's actions here do not rise to the level of plain error, we cannot approve of its refusal to allow defense counsel to reserve opening statements in a case of this duration and complexity.
 
 
 [7]
 We note that this quotation does not appear in the official trial transcript. See Trial Transcript, Dec. 22, 1988, at 2149 (Defense counsels' closing arguments and attorney Hunt's rebuttal argument not transcribed). The government does not contest the fact that the statement was made, however, and we therefore consider its effect in the context of the trial